**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Wanda VINING, Appellant.**

**Commonwealth of Pennsylvania, Appellee,**

v.

**Lee E. Jones, Appellant.**

Superior Court of Pennsylvania.

Argued April 30, 1999.
Filed Dec. 31, 1999.
Revised Jan. 4, 2000.

David Regoli, New Kensington, for Vining, appellant.

Christopher Huffman, Asst. Public Defender, Greensburg, for Jones, appellant.

Christian Scherer, Asst. Dist. Atty., Greensburg, for Com., appellee.

Before McEWEN, President Judge, and CAVANAUGH, DEL SOLE, JOHNSON, HUDOCK, EAKIN, JOYCE, MUSMANNO and ORIE MELVIN, JJ.

PER CURIAM.

¶ 1 The present appeals are from the judgments of sentence imposed upon Appellants, Wanda Vining and Lee Jones, following their convictions for numerous offenses stemming from the abuse of a two-and-a-half year old child who sustained injuries while in their care. Given the identical factual background and presence of common issues, resolution of both appeals can best be accomplished in a single opinion.[1]

¶ 2 The record regarding the factual background of this case reveals that on the morning of May 23, 1994, Ms. Laura Wright asked Wanda Vining and her live-in companion, Lee Jones, to baby-sit her two-and-a-half year old daughter Marlayna so that she could attend an appointment. This was not an unusual occurrence as Mr. Jones and Ms. Vining were the Wrights' neighbors and had often looked after their daughter in the past. However, what occurred that day was unusual. The day ended with Marlayna at Children's Hospital in Pittsburgh suffering from first and second degree burns on her chest, back, and legs and also with some bruises about her body and elevated enzyme counts, possibly indicative of some internal injuries. The nature of the injuries to Marlayna aroused suspicions in the health care workers prompting a notification of Children and Youth Services and the local police. For the next twelve days, Marlayna remained at Children's Hospital for treatment of her injuries. Following her release, she was placed into the custody of her maternal grandparents to permit her parents to receive counseling to assist them in dealing with Marlayna's injuries. During the hospitalization and afterward, an investigation was conducted which ultimately led to the arrests of Ms. Vining and Mr. Jones. Each were charged by separate informations of four counts of aggravated assault (Counts 1, 6, 12, and 13), a count of simple assault (Count 8), two counts of reckless endangerment (Counts 2 and 7), four counts of endangering the welfare of a child (Counts 3, 4, 9, and 10), and two counts of criminal conspiracy (Counts 5 and 11). The multiple counts reflect the separate allegations pertaining to the different injuries inflicted upon the child.

¶ 3 Ms. Vining, who lived in an apartment next to the Wrights, claimed that Marlayna was burned when she pulled a 48–ounce container of hot water down from the kitchen table onto herself after

---

1. The bulk of this Opinion is taken from the panel opinion in this case authored by the Honorable John G. Brosky, with his consent. That opinion was withdrawn upon the grant of this court's en banc review.

Ms. Vining had left the kitchen.[2] Ms. Vining recounted she was in the process of making tea and had boiled water and placed tea bags in the large thermal mug. After hearing the child cry out she ran into the kitchen and found Marlayna on the floor with her shirt soaked by the hot water. Ms. Vining picked Marlayna up and held her until Marlayna calmed down. She then removed her shirt and applied milk compresses and some ointment to the reddened skin. When Ms. Vining was finished taking care of the burns, she dressed Marlayna in a blue jumper that belonged to one of her children. Marlayna soon asked to take a nap, and Ms. Vining put her to bed.

¶ 4 At approximately 11:00 a.m. Laura Wright returned home and went to pick up Marlayna. Ms. Vining told Ms. Wright that Marlayna was still asleep. She made no mention of the fact that Marlayna had been burned because she feared Ms. Wright would "freak out." Ms. Wright decided to let Marlayna finish her nap rather than wake her up. Shortly thereafter Ms. Vining went to the Wrights' apartment and informed Kevin Wright that Marlayna had been burned but it was nothing serious. Mr. Wright decided to allow Marlayna to continue napping. Ms. Wright was never informed about the burn and at about 2:00 p.m. returned to get her daughter. Ms. Vining indicated Marlayna was still sleeping and again failed to mention the burn.

¶ 5 Ms. Vining further asserted that when Marlayna woke up she stated that she needed to go to the bathroom. Mr. Jones took her into the bathroom and helped her out of the jumper and then discovered that the burned skin had begun peeling. Mr. Jones called Ms. Vining in and upon seeing the condition of the burns Ms. Vining decided to take Marlayna immediately to the emergency room. Just outside of the apartment Ms. Vining ran into Ms. Wright. She explained Marlayna

had been burned, and the three of them proceeded to Citizens General Hospital. Sometime after they arrived at Citizens General Ms. Vining left. Marlayna was seen by an emergency room doctor and then taken to Children's Hospital in Pittsburgh when it was decided her condition was serious enough to warrant the specialized treatment that was available at Children's. In addition to the burns, Marlayna had some bruising around the genital/anal region as well as her back and thigh which Ms. Vining could not explain.

¶ 6 At trial Mary Carrasco, M.D. testified the burn pattern on Marlayna's body was unusual in that it took the shape of the clothing Marlayna had been wearing, specifically, a tank top, which indicated to Dr. Carrasco the burn was of a non-accidental origin. A similar opinion was rendered with regard to the bruises on Marlayna's back. Additionally, Marlayna presented with a distended and tender abdomen as well as with elevated enzyme counts. These symptoms were consistent with internal injury to the pancreas and liver and suggested some internal bruising of these organs. Dr. Carrasco testified that such an injury was consistent with a significant blow to the abdomen, either through an accidental trauma or being punched or kicked in the abdomen. Dr. Carrasco also opined Marlayna would have been in a great deal of discomfort and pain after experiencing the burns such that the need for immediate medical attention would be apparent, and further it was unlikely that Marlayna would have been able to sleep after sustaining such burns. Lastly, Dr. Carrasco testified the injuries were serious and, had there been significant internal injury, potentially life threatening as well. Additionally, Dr. Steven Myers, a pediatric surgeon, testified that upon asking the child who hurt or burned her Marlayna responded by uttering a name that sounded like "Rhonda."

---

2. Neither Ms. Vining nor Mr. Jones testified at trial, but both testified under oath and represented by counsel at a hearing regarding the investigation of the incident.

¶ 7 Ms. Vining and Mr. Jones were tried jointly and convicted by a jury on all counts. Ms. Vining and Mr. Jones were each sentenced to a period of incarceration of four (4) to eight (8) years. Post-trial motions were filed and denied. The present appeals followed.

### Commonwealth v. Wanda Vining

¶ 8 Appellant Vining raises four issues for our consideration: whether the evidence was sufficient to sustain the convictions for endangering the welfare of a child and conspiracy to commit that offense; whether the court erred in failing to grant a mistrial because of the prosecutor's remarks; whether the court erred in admitting the hearsay statements of the victim; and whether the court erred in denying a request to strike the jury panel after one of the jurors commented that she was afraid of the defendants.

¶ 9 Ms. Vining first challenges the sufficiency of the evidence to sustain her convictions on two counts of endangering the welfare of a child and conspiracy to endanger the welfare of a child.[3] We conclude that the evidence presented by the Commonwealth at trial was sufficient to sustain these convictions.

¶ 10 Initially, we note the well-known principle that upon a review of the sufficiency of the evidence we must view the evidence in favor of the Commonwealth as verdict winner allowing the Commonwealth the benefit of all reasonable inferences therefrom. *Commonwealth v. Jackson*, 506 Pa. 469, 485 A.2d 1102 (1984). Further we recognize that when addressing the sufficiency of the evidence, all testimony weighed by the fact-finder must be considered regardless of the admissibility of that evidence. *Commonwealth v. Savage*, 695 A.2d 820 (Pa.Super.1997).

¶ 11 Ms. Vining initially challenges her conviction under 18 Pa.C.S.A. § 4304, which provides that one endangers the welfare of a child if he or she knowingly violates a duty of care, protection or support. In order to sustain a conviction of this offense the Commonwealth must establish each of the following elements:

1) the accused is aware of his/her duty to protect the child;
2) the accused is aware that the child is in circumstances that could threaten the child's physical or psychological welfare; and
3) the accused has either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare.

*Commonwealth v. Pahel*, 456 Pa.Super. 159, 689 A.2d 963, 964 (1997).

¶ 12 Curiously, Ms. Vining does not challenge the sufficiency of the evidence to sustain the convictions for simple and aggravated assault. Although this is not the equivalent of a concession that the evidence was sufficient to uphold those convictions, the failure to challenge the evidence in that regard speaks volumes and begs the rhetorical question: if the evidence was sufficient to prove aggravated assault how could it fail to sustain a conviction for endangering the welfare of a child? The answer, we believe, is it cannot.

¶ 13 Dr. Carrasco indicated Marlayna had an elevation of her enzymes that was consistent with the internal bruising of the liver and pancreas. She further opined the most likely cause for this elevation in enzymes would be a major trauma to the abdomen such as might be seen if Marlayna had been in a severe accident or had been punched or kicked in the stomach in a very hard manner. N.T., Volume I, 2/7–19/97, at 586–87. Since there was an absence of evidence that Marlayna had suffered any kind of significant accident which was consistent with a major abdominal trauma, the jury was entitled to con-

---

**3.** After the close of the Commonwealth's case, the Commonwealth conceded the conspiracy charge applied only to the charge of endangering the welfare of a child.

clude that Marlayna had been intentionally punched or kicked in the stomach in a hard manner. Dr. Carrasco also testified that the pattern of the burns Marlayna sustained were not consistent with an accidental spilling. The above, in combination with Marlayna's response of "Rhonda" to Dr. Myers' question "who hurt you?" and "who burned you?", would allow the jury to conclude Ms. Vining had punched or kicked Marlayna in the stomach and somehow purposely burned her. The doctor further opined both the abdominal injury and the burning were rather severe. The combination of these factors certainly satisfies the elements recited above. Ms. Vining had a duty to protect Marlayna as she accepted the role of babysitter. As the person who had burned and beaten Marlayna, she would be aware the child was in circumstances that threatened her physical well-being and those injuries were severe in nature. And yet, despite this knowledge, she failed to seek immediate medical attention.

¶ 14 Ms. Vining asserts the evidence was insufficient because the Commonwealth did not establish she was aware of the seriousness of Marlayna's injuries until Marlayna awakened from her nap and it was discovered that the burns had begun peeling. Ms. Vining continues it was at this point that she did seek prompt medical attention for Marlayna. However, Ms. Vining's argument presupposes the finding of a more benign version of the facts than the Commonwealth is entitled to as verdict winner. As summarized above, the Commonwealth is entitled to a review based upon the assumption that Ms. Vining intentionally inflicted the severe injuries and that a reasonable person would have understood that they required immediate medical attention. As such, the evidence was sufficient to sustain the convictions for endangering the welfare of a child.

¶ 15 As to her challenge to the sufficiency of the evidence of a conspiracy to endanger the welfare of a child, Ms. Vining's entire argument in this regard was tied to the challenge to the sufficiency of the evidence of the underlying endangering the welfare of a child charge. She simply argues since the evidence was insufficient to support the conviction for endangering the welfare of a child, it must fail as to conspiracy as well. Without commenting on whether the evidence was sufficient to sustain this charge, we note this argument must fail for two reasons. First, as stated above the evidence was certainly sufficient to support the endangering charge. Second, her statement of law is patently incorrect.

¶ 16 Two individuals can conspire to commit a crime—to rob a bank for instance—but abandon the cause or be thwarted prior to completion and still be guilty of conspiracy. All that is required for a conspiracy is an **agreement** to commit a crime **and an overt act** in furtherance of the agreement or plan. *Commonwealth v. Rios*, 546 Pa. 271, 684 A.2d 1025 (1996). Indeed, in *Commonwealth v. Timer*, 415 Pa.Super. 376, 609 A.2d 572 (1992), we upheld a conviction for conspiracy to purchase and/or possess methamphetamine even though a sale never took place and was never going to take place because the undercover officers posing as suppliers had no intention of actually providing the drug. We reiterated that the evil which conspiracy seeks to punish is the **agreement** of two or more persons to act in concert for a criminal purpose. Thus, it is irrelevant to a conspiracy conviction that the crime supporting the conspiracy actually be proven. Rather, all that is necessary for the Commonwealth to prove is an agreement was reached to commit a crime and an overt act was taken in furtherance of it. Consequently, the argument advanced by Appellant can afford her no relief from the conspiracy conviction.

¶ 17 Ms. Vining next asserts a new trial is required because the trial court allowed inadmissible hearsay to her prejudice. She argues the testimony of Dr. Myers, to the effect that Marlayna responded "Rhonda" to his question "who burnt

you?" and "who hurt/hit you?", did not fall within any of the exceptions to hearsay and thus was improperly admitted over her objection. The trial court ruled after an *in camera* examination of Dr. Myers and full argument on the matter that the child's response was admissible as an excited utterance. The Commonwealth argues in support of the trial court ruling and as an alternative it claims that the response was properly admitted under the medical treatment/diagnosis exception to the hearsay rule. We disagree with both conclusions.

¶ 18 We recognize the admissibility of evidence is a matter addressed to the sound discretion of the trial court, and we may only reverse rulings on admissibility upon a showing that the trial court clearly abused its discretion. *Commonwealth v. Weber*, 549 Pa. 430, 701 A.2d 531 (1997).

¶ 19 As most recently noted by our Supreme Court:

The hearsay rule provides that evidence of a declarant's out-of-court statements is generally inadmissible because such evidence lacks guarantees of trustworthiness fundamental to the Anglo–American system of jurisprudence. Hearsay evidence is presumed to be unreliable because the original declarant is not before the trier of fact and, therefore, cannot be challenged as to the accuracy of the information conveyed. Exceptions to the hearsay rule are premised on circumstances surrounding the utterance which enhance the reliability of the contents of the utterance, and render unnecessary the normal judicial assurances of cross-examination and oath.

*Commonwealth v. Chamberlain*, 557 Pa. 34, 731 A.2d 593, 595 (1999) (citations omitted.)

¶ 20 In order for a statement to come within the excited utterance exception it must be:

a spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person had just participated in or closely witnessed, and made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from his [or her] reflective faculties.

*Commonwealth v. Carpenter*, 555 Pa. 434, 457, 725 A.2d 154, 165 (1999) (quoting *Commonwealth v. Washington*, 547 Pa. 550, 559, 692 A.2d 1018, 1022 (1997). The underlying rationale for this exception is that "the startling event speaks through the verbal acts of the declarant and vests reliability in an out-of-court statement whose accuracy would otherwise be suspect.... The spontaneity of such an excited declaration is the source of reliability and the touchstone of admissibility." *Chamberlain, supra*, at 596. Thus, an excited utterance is "the event speaking and not the speaker." *Commonwealth v. Zukauskas*, 501 Pa. 500, 462 A.2d 236 (1983). It is considered reliable and therefore admissible because it is made under the impact of an unexpected emotion and by such a traumatic event that the speaker, in effect is transformed into a "medium" for the message, and is no longer the messenger. *Id.*

¶ 21 When considering the factual circumstances surrounding Marlayna's statements, we conclude they do not meet the criteria for an excited utterance. The statements were made in direct response to repeated questioning. A review of Dr. Myers' testimony demonstrates the lack of spontaneity in the child's statements. He stated:

I asked the child if someone had hurt her. And she said yes. And I asked her who that was. And she made—she stated a word that sounded very much to me like Rhonda, but I had to ask her several times to make sure that the first part of the word I understood. I still had some difficulty, but my best recol-

lection of what she told me on repeated questioning and repeated answering was Rhonda.

She stated that she was burnt. I asked her did Rhonda burn you? She said yes. Were you hurt by Rhonda? And the answer was yes. And hit by Rhonda. I don't remember in what sequence we. asked those types of questions.

N.T. Vol. II ⁷⁄ – ¹⁹⁄₇, at 936–37.

¶ 22 The responses given to the questions posed by Dr. Myers were not proximate to the occurrence of the events in question and were not part of the same continuous transaction. The statements were made approximately ten to twelve hours after the incidents in question and after Marlayna had been in the company of numerous individuals. Indeed, despite the fact that Marlayna was in the presence of her parents, doctors, police officers and other health care workers for numerous hours after the alleged assault took place Marlayna never felt compelled enough by the unexpected, shocking and overwhelming nature of the experience to exclaim that "Rhonda" had beaten or burned her. Only upon being quizzed did she reply "Rhonda." Although the mere passage of time has not been found to negate an utterance as being induced by the overwhelming excitement of a shocking or traumatic event, generally speaking the passage of time will tend to diminish the spontaneity of the utterance and increase the likelihood that the utterance will be influenced by reflective thought processes or by contact with others.

¶ 23 Another factor greatly compromising the reliability of the statements is the fact that the utterance itself was in direct response to questions which presupposed an incriminating aspect. Dr. Myers did not ask Marlayna how she was burned or how she became bruised. He asked "who burned you" and "who hit you?" As such, the statements which were introduced into evidence were not Marlayna's statements as much as they were the statements of Dr. Myers. In so questioning Marlayna the responses did not transform Marlayna into a medium for the message of what she witnessed, but rather, she became the medium by which she could confirm the doctor's predetermined conclusions. Particularly in the case of a young child who may not be able to make or understand distinctions and nuances of language use, it is dangerous to be asking question that presuppose facts.

¶ 24 The general skepticism and concern underlying hearsay statements is grounded upon the fact that the declarant is not available for cross-examination to explain precisely what was meant by the statements, or explain the context in which they were made, nor is the declarant's veracity open for exploration and impeachment. As a result of these concerns the exceptions to the hearsay rules are always founded upon the reasoning that something about the exception makes the statement more reliable than the general class of hearsay statements. *See Commonwealth v. Smith*, 545 Pa. 487, 681 A.2d 1288 (1996). The doctor's testimony in this case details the circumstances in which the child's statements were made. It demonstrates that the child's responses were made to pointed questions many hours after she was injured, thereby reducing the statements' reliability and setting it outside of the hearsay exception for an excited utterance.

¶ 25 We are aware of the case of *Commonwealth v. Watson*, 426 Pa.Super. 496, 627 A.2d 785 (1993), which allowed the admission of a child's statement "my daddy did it," given in response to a question inquiring how he had burned his hand. However, there are factors which distinguish the present case from *Watson*. First and foremost is the fact that the response in *Watson* was more proximate in time to the incident. The child made the statement in the ambulance, which was called to the scene after he had been burned. In the present case the statement was not made until approximately twelve

hours after the incidents occurred. Secondly, the child in *Watson* was described as "crying and scared and nervous" when he made the statement, thus prompting the court to conclude that it was clear that the child was still "suffering from the emotional shock and trauma of that incident when he made that statement." *Id.* at 788. In contrast, Marlayna was described as lethargic and subdued and uncomfortable at the time she made her statements.

¶ 26 Also quite important is the fact that the child in *Watson* made the statement prior to having much contact with others and in response to a general question, as opposed to a leading question. The victim here made the statements after she had already been seen in the local emergency room, transported by ambulance to Children's Hospital in Pittsburgh, in the presence of her mother and EMTs, and after being seen by one or two doctors and various nurses at Children's Hospital. Marlayna was also asked specifically if "Rhonda" burned her, and if she was hurt by "Rhonda." Simply put, the factors presented in *Watson* are more in keeping with the spirit of the hearsay exception than those presented here. Those factors tended to reduce the possibility that the child's perception was influenced by the comments, questioning and conversations of others in his company after the incident but prior to the declaration, or by the form of the question put to him. The same indicia of reliability is not presented here and it would be inconsistent with the spirit of the excited utterance exception to allow the introduction of Marlayna's statements made to the doctor.

¶ 27 The Commonwealth argues that if the statement was improperly admitted as an excited utterance it was nonetheless properly admitted as a statement given for purposes of securing medical treatment. We cannot agree. In *Commonwealth v. Smith*, 545 Pa. 487, 681 A.2d 1288 (1996) our Supreme Court refused to expand the scope of the medical treatment exception beyond its relatively limited nature to include the identity of a perpetrator. In *Smith* a nurse treating a young child suffering from severe burns asked the child what happened to her and the child responded: "[d]addy turned on the hot water and daddy put me in the water." *Id.* at 1290. The Court set forth the prevailing view that the identity of the assailant or perpetrator who may have caused the injury for which medical treatment is being sought, is not within the medical treatment exception because the identity of the abuser is not pertinent to medical treatment. While disclosing the events surrounding an injury may be important for medical treatment or diagnosis, identifying the person responsible for the injury is not medically necessary. It can be argued that the physical characteristics of a perpetrator may be relevant for diagnosis. Although it is conceivable that it may be important to learn that the perpetrator was an male adult, there is no reason consistent with the medical treatment exception to admit the identity of the perpetrator.

¶ 28 Thus, we conclude the statements of Marlayna were inadmissible hearsay. Inasmuch as these statements are the only evidence directly linking Appellant to the infliction of injuries to the child, we further conclude their admission was highly prejudicial. The nature of the statements made in response to particular questions, suggested the injuries were intentionally inflicted, not the result of an accident, as Appellant claimed at the time. As such, the admission of these statements was crucial evidence against Appellant. Consequently, we must conclude that the admission of the hearsay statements was prejudicial to a degree requiring the grant of a new trial.

¶ 29 Given our decision to grant Appellant a new trial, we find it unnecessary to address the other contentions of error she raises.

**Commonwealth v. Lee Jones**

¶ 30 Mr. Jones sets forth the following nine issues for our review:

1.) Whether the Commonwealth has failed to establish that Lee [J]ones acted as the principal or an accomplice in the crimes charge[d] in Counts 1 through 13 of the Information filed at 3180 Criminal 1994?

2.) Whether the Commonwealth has offered evidence consistent with the opposing propositions and thus has proven neither?

3.) Whether the statements made by Marlayna Wright to Dr. Myers were admissible as an excited utterance?

4.) Whether the comments made by one juror, that she was afraid of the defendants, which all selected jurors became aware of, required the court to dismiss the jury?

5.) Whether comments made in closing arguments by the assistant district attorney, . . ., which were completely unsupported by facts, constitutes prosecutorial misconduct?

6.) Whether testimony elicited by the assistant district attorney, . . ., which she knew would be different than what was given in her offer of proof, was prosecutorial misconduct?

7.) Whether the assistant district attorney, . . ., committed prosecutorial misconduct when she asked Laura Wright if she had ever observed the effects of physical violence between the defendants?

8.) Whether the assistant district attorney, . . ., committed prosecutorial misconduct when she argued a law to the jury which does not exist?

9.) Whether the Commonwealth failed to present testimony which established that Lee Jones knew that the injuries sustained by Marlayna Wright were of a serious nature that required immediate medical attention?

Mr. Jones' brief at 3.

¶ 31 We begin by addressing Appellant Jones' challenges to the sufficiency of evidence as to all charges. He argues the Commonwealth presented no evidence he acted as a principal in any of the charges, and also the Commonwealth failed to establish that he acted as an accomplice.[4] With respect to most of the charges for which Appellant was convicted, we must agree.

 ¶ 32 Our well-established standard in reviewing a sufficiency of the evidence claim is that viewing the evidence in a light most favorable to the Commonwealth, we must determine whether the evidence presented at trial, including all reasonable inferences that may be drawn therefrom, was sufficient to prove all the elements of the crime for which the appellant challenges beyond a reasonable doubt. *Commonwealth v. Uderra*, 550 Pa. 389, 396, 706 A.2d 334, 337 (1998). Moreover, we must keep in mind that "[t]he credibility of witnesses and the weight to be accorded the evidence produced are matters within the province of the trier of fact, who is free to believe all, some or none of the evidence." *Commonwealth v. Perez*, 698 A.2d 640, 645 (Pa.Super.1997).

¶ 33 We are cognizant of the difficulties often facing the prosecution in cases of child abuse. Typically in such cases one finds, as here, the only witnesses to the events that transpired are a young victim and the alleged perpetrators. Nonetheless, the law still requires the Commonwealth prove the elements of each crime beyond a reasonable doubt as to each codefendant individually. The trial court candidly concedes no direct evidence was presented that Mr. Jones personally com-

---

**4.** All the counts except 4, 5, 10 and 11 are based upon allegations that appellant was either a perpetrator of the assaults or an accomplice in the perpetration of the assaults. Counts 4 and 10 set forth charges of endan-gering the welfare of a child based upon an omission, the failure to seek prompt medical treatment, and counts 5 and 11 allege a conspiracy to commit endangering the welfare of a child.

mitted the assaults supporting the numerous offenses charged. While the Commonwealth presented sufficient evidence to permit the jury to legally conclude that an intentional assault had taken place, the problematic nature of this finding is identifying who inflicted the assaults. The only evidence tending to identify the assailant was the hearsay statements of Marlayna. However, that identification was of "Rhonda" which the jury could reasonably interpret to mean Wanda Vining. There was no evidence presented which pointed to Mr. Jones as the perpetrator of the assaults in question.

¶ 34 Apparently aware of the lack of evidence directly tying Mr. Jones to the commission of the assaults as well as a lack of circumstantial evidence showing direct participation in the assault, the Commonwealth relies heavily upon an accomplice theory. However, the Commonwealth has similarly failed to present any evidence Mr. Jones acted as an accomplice and essentially relies upon a basic assumption that since he was present during or after the injuries were sustained, and given his close relationship with Wanda Vining, he must have been an accomplice. Of course, this is the quintessential "guilt by association" theory which has been soundly rejected in our jurisprudence.

▇▇▇ ¶ 35 The very nature of accomplice liability is that one who **actively** and **purposefully** engages in criminal activity is criminally responsible for the criminal actions of his/her co-conspirators which are committed in furtherance of the criminal endeavor. However, in order to impose this form of criminal liability the individual "must be an active partner in the intent to commit [a crime]." *Commonwealth v. Fields*, 460 Pa. 316, 319–20, 333 A.2d 745, 747 (1975). Further, an accomplice "must have done something to participate in the venture." *Commonwealth v. Flowers*, 479 Pa. 153, 156, 387 A.2d 1268, 1270 (1978). Lastly, "mere presence at the scene is insufficient to support a conviction: evi-

dence indicating participation in the crime is required." *Commonwealth v. Keblitis*, 500 Pa. 321, 324, 456 A.2d 149, 151 (1983). Most importantly, the law requires some proof that a party was an active participant in a criminal enterprise in order to impose accomplice liability. Such a finding cannot be based upon mere assumption or speculation. In *Commonwealth v. Garrett*, 423 Pa. 8, 222 A.2d 902 (1966), our Supreme Court stated:

> Appellant's presence on the scene, both immediately prior and subsequent to the commission of the crime, was established. This fact, however, in the absence of other evidence indicative of appellant's participation in the robbery, did not warrant submission of the case to the jury.

Although the Commonwealth proved Mr. Jones' was present in the apartment before and after the assault(s), it presented no additional evidence Mr. Jones participated in them or otherwise helped to facilitate them. As such, the Commonwealth has not proven Mr. Jones acted as an accomplice in the commission of the offenses in question.

▇▇▇ ¶ 36 The Commonwealth also argues Mr. Jones is "liable by omission," that his mere presence in a small apartment is sufficient to impose liability as if he had personally assaulted the victim because he did not prevent the assault. This is an interesting and novel argument but one which is virtually unsupported in law. Under this theory Mr. Jones had an obligation to protect and care for Marlayna and his dereliction of that duty made him an accomplice to the assault and, essentially, just as culpable as if he personally beat and burned the child. Under the circumstances of this case we cannot agree.

¶ 37 We have found only one case in which an individual was found culpable by omission for the intentional assault of another. In *Commonwealth v. Howard*, 265 Pa.Super. 535, 402 A.2d 674 (1979), a child's mother, Darcel Howard, was found

guilty of involuntary manslaughter for failing to intervene and/or prevent beatings and abuse of her daughter at the hands of Howard's live-in boyfriend. In affirming the conviction we acknowledged the terms of 18 Pa.C.S.A. § 301(b)(2), the very same section the Commonwealth suggests provides a basis for imposing criminal liability in the present case. This section allows imposition of criminal liability based upon an omission, as opposed to an act, where a duty to perform the omitted act is otherwise imposed by law. A panel of this Court determined that Howard's "failure to protect the child was a direct cause of her death, and that such failure was reckless or grossly negligent under the circumstances." *Id.* at 676.

¶ 38 Although criminal liability was imposed upon Ms. Howard for the direct assaults committed by her boyfriend, Edward Watts, the circumstances of the *Howard* case are considerably different than those presented here. *Howard* involved a case of a "continuing pattern of severe beatings, abuse, and sadistic torture inflicted on her child by Watts over a period of at least several weeks." *Id.* at 678. Although Ms. Howard was found criminally liable for failing to prevent her child's death, liability was not imposed because she failed to step in when the fatal blows were being administered but rather because "[Ms. Howard] did nothing to protect her child. She never evicted or even discouraged Watts. She never reported anything to the public authorities." *Id.* Thus, her liability was founded upon her failure to take steps during the periods between the beatings and assaults.

¶ 39 It is one matter to impose criminal liability when a parent or caretaker fails to alert authorities when there is knowledge of an ongoing and regular abuse of a child at the hands of another. It is quite another matter altogether to impose liability when an individual fails to prevent an unexpected and sudden assault on a child. We must be mindful that the premise of this form of liability is that the person who did nothing is just as culpable as the one who inflicted the assault.[5] At first blush this theory of liability may appear to fly in the face of the fundamental concepts of personal responsibility and personal liability. However, when considering liability for a failure to intervene during weeks of abuse this theory has a certain visceral appeal. Such inactivity in the face of a known danger should certainly not be condoned, and it would not seem fundamentally unfair to attach some, if not equal, criminal liability to such an omission. But to impose the same degree of culpability upon one whom witnesses, but fails to prevent, a brutal attack of another is less convincing. The person who witnesses a brutal attack has less time to reflect upon the matter, less time and opportunity to intervene and may place him/herself in harm's way if he/she attempts to intervene.

¶ 40 The above concerns notwithstanding, and assuming such a theory is legally viable, the Commonwealth's argument still fails because imposing liability under the above theory presupposes that an attempt to intervene would have been successful.[6] In this regard the Commonwealth has failed to establish that Mr. Jones had an opportunity to prevent the abuse which occurred here. The only evidence presented by the Commonwealth that established his whereabouts during the period in question was the testimony of Laura Wright, who testified Mr. Jones was present when

---

5. Essentially, this is additional liability above that provided for in Endangering the Welfare of a Child in which the failure to act is an element of the offense. *See Commonwealth v. Pahel*, 456 Pa.Super. 159, 689 A.2d 963 (1997).

6. Imposition of criminal liability in *Howard* was predicated, in part, upon a causation analysis where Ms. Howard's inactivity was concluded to be a legal cause of the child's death. Thus, to prevail upon this theory the Commonwealth would need to establish not only an opportunity to intervene but that the failure to intervene resulted in the assault or injury supporting the criminal charges.

she dropped Marlayna off in the morning, and the testimony of Mr. Jones and Ms. Vining from a prior hearing. Mr. Jones and Ms. Vining both indicated he was on the couch in the living room when Marlayna got burned. Although the jury was not required to believe their testimony, the Commonwealth presented no other evidence that Mr. Jones was close enough to Marlayna when she was assaulted, or that the assaults were prolonged enough, to allow him an opportunity to intervene. As such, it was not proven that Mr. Jones had a reasonable opportunity to intervene and prevent the assaults from occurring and, therefore, the convictions cannot be sustained under this theory.

¶ 41 As a result of the above analysis we must conclude the evidence was insufficient to sustain the convictions on counts 1 (aggravated assault), 2 (reckless endangerment by burning), 3 (endangering welfare of child by burning), 6 (aggravated assault), 7 (reckless endangerment regarding by beating), 8 (simple assault), 9 (endangering welfare of child by beating), 12 (aggravated assault) and 13 (aggravated assault). These charges were all related to, and dependent upon, a finding that Mr. Jones either beat and burned Marlayna himself, or acted as an accomplice in the beating and burning of Marlayna. The Commonwealth did not present sufficient evidence from which a jury could reasonably make these findings.

¶ 42 However, as to the sufficiency of the evidence of the charges at counts 4 and 10, for endangering the welfare of a child by failure to seek prompt medical attention, and at counts 5 and 11, for conspiracy by failure to seek prompt medical treatment with the intent of facilitating the crime of endangering the welfare of children, we conclude that sufficient evidence was presented to sustain the convictions on those charges.

¶ 43 As to the crimes of endangering the welfare of a child, these two charges relate to Mr. Jones' breach of his obligation, as temporary caregiver of Mar-

layna, to seek prompt medical treatment. As we concluded above, the evidence may have been insufficient to establish his liability as to the assaults on Marlayna, either as having inflicted them personally or being an accomplice to them. Nevertheless, there was evidence he was present in the apartment sometime after Marlayna was burned and, as the jury found, beaten, and that the nature of the injuries to Marlayna would have been apparent. Despite this fact, medical attention was not sought for several hours after the sustaining of these injuries. The jury was entitled to find from this evidence that Mr. Jones knew Marlayna had been injured and was in need of medical attention, yet failed to immediately seek medical attention for Marlayna.

¶ 44 With respect to the conspiracy convictions there is no developed argument which attacks these convictions. Mr. Jones' general thesis attacks the evidence that he personally inflicted the injuries or was an accomplice. Conspiracy is a crime involving the agreement to commit a crime. As such, his attacks on direct or accomplice liability do not relate to the separate crime of conspiracy for failing to seek prompt medical attention, and no other challenge has been presented. Consequently, there being no challenge to the conspiracy convictions those convictions must stand. As such, we conclude that the evidence was sufficient to support the convictions on counts 4, 5, 10 and 11.

¶ 45 With respect to these convictions Appellant, like his co-defendant Ms. Vining, challenges the admission of the hearsay response of Marlayna as testified to by Dr. Myers. We have already determined that this testimony was inadmissible and have ruled that it was prejudicial to Vining, requiring her to receive a new trial. This evidence, however, pointed to the culpability of Vining in an intentional assault on the child. This testimony had no relevance to the charges against Appellant Jones for endangering the welfare of a

child. These charges related to Appellant's failure to seek medical attention for the injured child, regardless who injured the child or if the injury was intentionally inflicted. Thus we find, as to these charges, the admission of this hearsay testimony was not so prejudicial as to warrant an award of a new trial.

¶ 46 We have examined the remainder of Appellant's arguments and given them full consideration. Having done so we have concluded that these claims have either been rendered moot by our reversal of Appellant's convictions on the above-named counts, or alternatively, have been adequately responded to by the trial court it its opinion. We see no need to disturb the court's ruling or expand on its discussion.

¶ 47 To summarize, the judgment of sentence imposed upon Appellant Wanda Vining is vacated and the case is remanded for a new trial. The convictions imposed upon Appellant Lee Jones for counts 1, 2, 3, 6, 7, 8, 9, 12 and 13 of the information, comprising multiple charges of aggravated assault, simple assault and endangering the welfare of a child, are reversed and the related sentences vacated. The convictions and related sentences imposed upon Appellant Lee Jones for counts 4, 5, 10 and 11 of the information, comprising two counts each of endangering the welfare of a child and conspiracy, are affirmed.

¶ 48 Judgment of sentence imposed upon Wanda Vining vacated and the matter remanded for a new trial. Judgment of sentence imposed upon Lee Jones affirmed in part, and vacated in part. Jurisdiction relinquished.

¶ 49 CAVANAUGH, J., files a concurring opinion.

¶ 50 ORIE MELVIN, J., files a concurring and dissenting opinion in which HUDOCK, EAKIN and HOYCE, JJ., join.

CAVANAUGH, J., concurring:

¶ 1 I join the Opinion Per Curiam with respect to the award of a new trial for Wanda Vining. I also join in the reversal and vacation of the convictions of appellant, Lee Jones, for counts 1, 2, 3, 6, 7, 8, 9, 12 and 13. As to the convictions of appellant, Lee Jones, for counts 4, 5, 10 and 11, I would grant a new trial as I feel it is inappropriate to affirm a conviction on a properly diminished record.

ORIE MELVIN, J., dissenting and concurring.

¶ 1 I respectfully dissent from the majority's resolution of the hearsay issue as I find the instant facts to be sufficiently similar to those in *Commonwealth v. Watson*, 426 Pa.Super. 496, 627 A.2d 785 (1993) as to be indistinguishable. I would therefore affirm the judgment of sentence imposed upon Wanda Vining. I also concur and dissent in the result reached by the Majority in the appeal by Lee Jones.

¶ 2 In the Vining appeal the majority, in exploring the factors that allegedly distinguish this case from *Watson*, incorrectly assumes that "the response in *Watson* was more proximate in time to the incident." Majority Opinion at 318. My reading of *Watson* indicates there was no evidence of the time frame between when the child was burned and when the ambulance was called. The defense in *Watson*, as in the present case, argued the statement was influenced by the lapse of an **undisclosed period of time** after the child had been injured and therefore lacked the spontaneity of an excited utterance. In finding the statement admissible as an excited utterance the *Watson* Court noted that "[l]ength of time is an element that must be weighed along with other considerations. It varies with the circumstances and from case to case. It does not alone decide admissibility." *Id.* at 788. In *Watson*, the only evidence of when the child was burned was the doctor's opinion that it would have been within the last twenty-

four hours. Hence, proximity cannot be a distinguishing factor.

¶ 3 Next, the majority relies upon the fact that the child in *Watson* was described as 'crying and scared and nervous' contrasted with the description of the instant victim being "lethargic and subdued and uncomfortable." Majority Opinion at 319. The actual complete description of the doctor's observation of the victim reads as follows:

Q. And could you tell me, please, Doctor, what you observed when you examined the child?

A. I examined—I observed that the child was in discomfort, was somewhat lethargic, was very irritable and appeared to be in pain.

N.T. Volume II, 2/7–19/97, at 975. The majority's paraphrasing of this testimony does not do justice to the victim's condition. Moreover, the Doctor further testified that he prescribed morphine for the pain. Surely this child was still suffering from a traumatic event and the severe physical pain which accompanied it.

¶ 4 The majority next finds a distinction based upon the number of people the respective victims came in contact with prior to making the statement. In this regard the only contacts the child had were with her mother, while being transported to the hospital, and with the medical personnel. The mother testified that she merely held her child on the way to the hospital and did not ask her any questions, believing what she had been told that it was an accidental burning. The mother's testimony was not contradicted and her credibility was a matter for the trial judge to resolve. I am not persuaded that contact with various medical personnel could have in any way caused the statement to emanate from the child's reflective faculties. I am satisfied that there is ample evidence here to support the trial court's conclusion that

insofar as the child was concerned, the startling event was on-going and she was still under its influence. It is doubtful that a 2½-year-old child, who only had limited contact with her parents during the time she was being treated, would have engaged in independent thought sufficient to fabricate a statement to be made to others.

¶ 5 The excited utterance exception properly understood relates to a lack of capacity to fabricate rather than the lack of time to fabricate. Therefore, the question is not whether it is likely that the child's statements were falsely made but rather whether the totality of the circumstances surrounding the making of the statements suggest reliability and lack of opportunity for the deliberation and preparation attendant to giving a false statement. Generally, there are three essential components to this exception. First, there must be an event startling enough to cause nervous excitement. Second, the statement must be made while the person is under the stress of excitement caused by the event. Third, the statement must have been made before there had been time to contrive or misrepresent.

¶ 6 There is no bright line test by which to measure the length of a permissible time gap for the number of hours or days that the excitement can be said to continue from the stress of a crime. All that is required is a showing that the time was sufficiently short under the facts to fall within the limits of the exception. I believe under the compelling circumstances of child abuse a liberal evaluation of this exception should be employed. Moreover, I note that the special circumstance attendant to child abuse victims and witnesses has also been recognized by our legislature's enactment of the Child Victims and Witnesses Act. 42 Pa.C.S.A. §§ 5981–5988.[7]

---

7. The tender years exception to the hearsay rule provides:

§ 5985.1. **Admissibility of certain statements**

(a) **General rule.**—An out-of-court statement made by a child victim or witness, who at the time the statement was made was 12 years of age or younger, describing

¶7 The final distinction raised is that the instant victim responded to a leading question as opposed to a general question. The question "who burnt you" does not suggest the answer, thus I fail to see how it is leading. In any event the form of the question does not bear upon whether or not a statement is an "excited utterance." As noted in *Commonwealth v. Pronkoskie*, 477 Pa. 132, 141, 383 A.2d 858, 862 (1978), our Supreme Court has repeatedly held "that the mere fact that a statement is made in response to a question does not prevent its admission as a *res gestae* statement." (citing *Commonwealth v. Banks*, 454 Pa. 401, 311 A.2d 576 (1973) and *Commonwealth v. Edwards*, 431 Pa. 44, 244 A.2d 683 (1968)).

¶8 I would also point out that the trial court conducted an *in camera* hearing where all of these factors were examined and weighed by the trial court. In reaching its decision the court stated:

This has been a question that I have been grappling with for several days and trying to resolve in my own mind. And I needed to hear everything that there was to hear before making the decision. The only condition that's really dispositive, the only factor really dispositive, the declarant must have been subjected to some shocking event. After that point all other surrounding circumstances are to be considered. And all those other factors that are listed in the case law are not in an [sic] of themselves dispositive but are factors to consider along with everything else. Obviously in this case the victim's mind was made subject to the overpowering emotion that was caused by the unexpected and shocking event of being burned. The

statement to Doctor Meyers in my estimation was made in response obviously to the questions of the doctor. But in my mind there's no indication that the statements that were made by this child were the result of some premeditation and consideration by the child or by some design on her part. I do believe that the spontaneity of the statement was maintained even though they were in response to the questions of the doctor. As I indicated previously, there is no clear-cut rule as to the time period that must pass before such statement should or must be excluded. And as I said to Mr. Huffman ..., this statement was made during a continuing course of treatment of the child for her injuries. This continuous course of treatment at the various hospitals was in my determination actually really a continuation or closely related to the shocking event that took place earlier in the day. In addition, I have not heard any evidence to establish that the child, in fact, was subjected to any influence or coaching. Nor do I believe the circumstances indicate that this statement was the result of some confabulation on the part of the child. For all those reasons I'm going to determine and find that the statement is admissible and will hear the doctor, ....

N.T. Volume II, 2/7–19/97, at 968–970.

¶9 It is important to remember that the admissibility of evidence is a matter addressed to the sound discretion of the trial court, and that we may only reverse rulings on admissibility upon a showing that the trial court clearly abused its discretion. *Commonwealth v. Weber*, 549 Pa. 430, 701

physical abuse, indecent contact or any of the offenses enumerated in 18 Pa.C.S. Ch. 31 (relating to sexual offenses) performed with or on the child by another, not otherwise admissible by statute or rule of evidence, is admissible in evidence in any criminal proceeding if:

(1) the court finds, in an in camera hearing, that the evidence is relevant and that the time, content and circumstances of the

statement provide sufficient indicia of reliability; and

(2) the child either:

(i) testifies at the proceeding; or

(ii) is unavailable as a witness.

(Emphasis added). This provision was amended in 1996 to make it applicable to cases of **physical** as well as sexual abuse. However, at the time of the start of the instant trial it had not yet become effective.

A.2d 531 (1997). Keeping this standard in mind, I fully agree with the trial court's analysis of this issue and can find no abuse of discretion.

¶ 10 Therefore, I would affirm the judgment of sentence as to Wanda Vining.

¶ 11 As to Lee Jones, I join the majority's determination to reverse as to counts 1, 3, 6, 8, 9, 12 and 13 of the information. However, as to the reversal on counts 2 and 7, I would merely vacate the convictions and remand for a new trial for the following reason. Applying the Majority's analysis with respect to the endangering the welfare of a child charges at counts 4 and 10, I likewise would find that there was sufficient evidence to sustain the convictions at counts 2 and 7, relating to reckless endangerment 18 Pa.C.S.A. § 2705, based upon the failure to seek prompt medical attention. In *Commonwealth v. Cottam*, 420 Pa.Super. 311, 616 A.2d 988 (1992), this Court held that criminal liability for the offense of reckless endangering another person can be based upon an omission if an omission, where a duty to act was recognized, created a substantial risk of death or great bodily harm. However, since this theory was not charged and a jury is not permitted to base its verdict on a theory not charged, *see Commonwealth v. Taylor*, 324 Pa.Super. 420, 471 A.2d 1228 (1984), I would merely vacate these convictions and remand for a new trial.

¶12 HUDOCK, EAKIN and JOYCE, JJ., join in this dissenting and concurring opinion.