J-S79039-14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| MICHAEL SCOTT DASBURG, | : | |
| | : | |
| Appellant | : | No. 1858 EDA 2014 |

Appeal from the Judgment of Sentence Entered January 14, 2014,
in the Court of Common Pleas of Bucks County,
Criminal Division, at No(s): CP-09-CR-0005890-2013

BEFORE: ALLEN, OLSON, and STRASSBURGER, JJ.*

MEMORANDUM BY: STRASSBURGER, J.: **FILED JANUARY 13, 2015**

Michael Scott Dasburg (Appellant) appeals from the January 14, 2014 judgment of sentence of eight to twenty years of incarceration imposed following his conviction for one count of aggravated assault, 18 Pa.C.S. § 2702(a)(1). We affirm.

The trial court summarized the facts underlying Appellant's conviction as follows.

> On November 4, 2012, the victim, then seven weeks old, had developed a fever and was brought to Grand View Hospital by his family. Dr. Elizabeth Jamme, M.D., an in-patient pediatric hospitalist who worked at Grand View Hospital that day, testified that as part of the standard of care for infants with high fevers, a spinal tap procedure was performed on the victim by Dr. Sheila Knerr. The procedure was simple and a typical spinal tap.
>
> Immediately following the procedure, Dr. Jamme evaluated the victim and noticed nothing out of the ordinary. After approximately two hours, Dr. Jamme was summoned to evaluate the victim due to concerns that the victim's left leg was swollen.

_____
*Retired Senior Judge assigned to the Superior Court.

X-rays were immediately ordered, and the results showed that the victim suffered from a displaced fracture of his left femur. Alexandra Ries, a nurse who assisted in the spinal tap procedure, testified that in her opinion, nothing was done during the spinal tap that could have caused such a fracture, the fracture was likely present prior to the procedure, and the spinal tap may have displaced the fracture. The victim also had subconjunctival hemorrhages, which are essentially patches of blood on the surface of the eyeball that can be caused by trauma or excessive crying. Dr. Jamme was concerned that the leg injury could require immediate surgery due to potential bleeding in the region of the leg.

Amongst the individuals present at Grand View on behalf of the victim were [Mother] and the Appellant.[1] Upon hearing of the displaced fracture, Appellant vocalized that he thought that it had to have occurred during the spinal tap procedure. Dr. Jamme testified at trial that she had performed one hundred or more spinal taps and that she had never heard of a displaced fracture occurring during a routine spinal tap. Like Ries, she also testified that most likely the fracture in the femur was already present at the time of the spinal tap, and it was just displaced because of the way the victim had to be held during the spinal tap. After additional x-rays were performed, she discovered an additional fracture on the other side of the leg, called a metaphyseal or bucket fracture, on the very [corner] of one of the lower bones. Dr. Jamme testified that this type of fracture is pathognominic, meaning there is no cause for it other than a traumatic abuse situation. She arranged for transport of the victim from Grand View to Children's Hospital of Philadelphia ("CHOP"). The victim was transported by helicopter to CHOP.

Dr. Samantha Schilling, M.D., a pediatrician at CHOP, was working as a part of the child abuse team at CHOP and assisted in the care of the victim when he was brought in on November 4, 2012 until November 8, 2012. After Dr. Schilling and her team reviewed all of the testing, some of which came back months later, they determined that the diagnosis was child physical abuse. The first of two skeletal surveys performed on the victim

---

[1] Appellant is Mother's boyfriend and not the victim's biological father.

at CHOP revealed three types of fractures. First, the victim had the displaced fracture of his left femur, which is the biggest bone in the body, yet it was broken all the way through. Secondly, he had approximately four different fractures to his ribs, in particular the posterior or back of the ribs and side of his ribs. Dr. Schilling explained that posterior fractures of the ribs are more concerning for child abuse as they are likely to be caused by some compression of the chest such as squeezing or stepping on. Finally, the skeletal survey revealed several metaphyseal fractures, which were present on the femur and tibia of his right leg, the femur of his left leg, the humerus of his right arm, and the radius of his left arm.

Subsequently, a second skeletal survey was performed approximately two to three weeks later, which confirmed the fractures described above and also showed additional injuries that were previously present, but not detected. These included two more posterior rib fractures, a metaphyseal chip fracture, a fracture of the right clavicle, and a fracture in the middle of the femur of his right leg. Dr. Schilling testified that the fractures to the right clavicle and right femur, as they were through the middle of the bone, are likely to be caused from blunt force trauma. The skeletal surveys revealed that the fractures were also in multiple stages of healing, which Dr. Schilling testified was a sign that the victim experienced multiple traumas over time, not just one terrible trauma, and these injuries were unlikely to have occurred due to an accident. The major femur fracture was determined to be newer and the rib fractures were older, approximately two to four weeks old when discovered in the first skeletal survey.

The victim, being only seven weeks old, and therefore, dependent on adult caregivers for everything, could not have done something to cause an accident and injure himself. Numerous tests were done to determine whether the injuries were a result of some other condition such as vitamin D deficiency or genetic disorders. Ultimately, it was determined that the victim did not have any such condition, and Dr. Schilling diagnosed the victim's injuries as a result of child physical abuse.

The Hilltown Township Police Department investigated Appellant and the other family members who cared for the victim

to determine who caused the victim's injuries.[2] [Mother] attended college approximately two days per weeks and in this time, left the victim in Appellant's care. On one particular morning, after Appellant had watched the victim for the night, [Mother] noticed a small bruise right below the victim's eye, and Appellant denied knowledge of its cause. [Mother] also testified that she observed Appellant get angry with the victim for crying, because of the victim's picky eating habits, and the victim's resemblance to his biological father. Further, whenever Appellant held the victim, whether to change his diapers or to feed him, the victim would always cry. When Appellant would change the victim's diapers, Appellant would take the victim to his nursery and shut the door behind him. If [Mother] attempted to assist as a result of the victim crying, Appellant would shut the door or tell [Mother] to trust him and that he knew what he was doing. In one instance, Appellant slammed the door in [Mother's] face. On a few occasions, Appellant became aggravated that [Mother] kept walking in and left the victim on the changing table and told [Mother] to finish. On another occasion, Appellant was angry after changing the victim's diaper and thrust the victim aggressively into [Mother's] hands.

[Mother] also testified to other instances where Appellant inappropriately handled the victim. For instance, Appellant would hold the victim up in the air like an airplane when the victim was only a few days old. Appellant would also have the victim stand on his legs and Appellant would hold the victim up by his arms, which prompted [Mother] and [Maternal Grandmother] to tell Appellant to stop as the victim was too young for that type of handling.

Additionally, when [Mother] wanted to take the victim to the hospital for the high fever, Appellant became angry and gave the reason that the insurance had run out and they would have to pay for it out of pocket. Subsequent to the victim's hospitalization, Appellant stated that he may have handled the

---

[2] Mother, Appellant, and the victim lived in the finished basement of a home owned and lived in by Maternal Grandmother and Maternal Grandmother's husband. Also living at the home were Mother's fifteen-year-old sister and two-year-old brother.

victim too roughly, and that he did not know his own strength. Appellant also became angry when CHOP wanted to perform additional tests on the victim to determine whether there were more injuries. Furthermore, when questioned by detectives, Appellant distanced himself from having cared for the victim. Appellant stated that he did not really take care of the victim and that he did not trust himself with a baby after working 12 to 14 hours. He also explained that when [Mother] went to school, it was [Maternal Grandmother] who cared for the victim. Appellant also blamed Grand View Hospital for the victim's fractured left femur.

Trial Court Opinion, 7/14/2014, at 2-6 (citations to the record omitted; footnotes added).

Having heard this evidence, a jury convicted Appellant of aggravated assault on January 14, 2014. Appellant was immediately sentenced as outlined above.[3] Appellant timely filed a post-sentence motion, which was denied, after a hearing, on March 31, 2014. Appellant timely filed a notice of appeal, and both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant presents one question on appeal: "Was the evidence sufficient to support the guilty verdicts?" Appellant's Brief at 4.

---

[3] During the same sentencing proceeding, Appellant was sentenced for burglary, at CP-09-CR-0003949-2013, to a consecutive term of two to four years' incarceration. He was also sentenced for burglary and criminal conspiracy, at CP-09-CR-0005894-2013, to 20 years' probation to be served concurrently with the previously imposed sentence. Finally, at CP-09-CR-0002826-2013, Appellant was sentenced to five years' probation to run concurrently with the other sentences.

We consider a challenge to the sufficiency of the evidence pursuant to the following standard.

> [O]ur standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

*Commonwealth v. Pettyjohn*, 64 A.3d 1072, 1074 (Pa. Super. 2013) (internal quotations and citations omitted). The Commonwealth may sustain its burden by means of wholly circumstantial evidence, and we must evaluate the entire trial record and consider all evidence received against the defendant. *Commonwealth v. Markman*, 916 A.2d 586, 598 (Pa. 2007).

Appellant was convicted of violating subsection 2702(a)(1) of the crimes code, which provides in relevant part: "A person is guilty of aggravated assault if he … attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]" 18 Pa.C.S. § 2702(a)(1).

Appellant acknowledges that the victim suffered "serious bodily injury;" however, Appellant asserts that he did not cause those injuries.

Appellant's Brief at 11. Specifically, Appellant contends the evidence presented by the Commonwealth showed that Mother was the victim's abuser and "[n]o evidence was presented that definitively pointed to Appellant." *Id*. at 12. Appellant argues that Mother spent 23 out of 24 hours a day with the victim; she was his primary caregiver; and she was interviewed by police accompanied by a criminal defense attorney. Appellant suggests the evidence "pointed to [Mother]" and "the jury was required to guess to convict Appellant" because it "is quite clear that the fact finder wanted someone to be held accountable." *Id*.

The trial court responded to Appellant's argument as follows.

First, evidence at trial supported that the victim had only been cared for by three individuals up to that point: Appellant, [Mother], and [Maternal Grandmother]. Both [Mother] and [Maternal Grandmother] testified and denied causing the injuries to the victim. The jury ultimately determined their testimony to be honest and credible in finding Appellant guilty of the crime charged. Further, testimony was presented regarding Appellant's anger towards the victim, an infant, for various issues such as the victim's crying, picky eating habits, and resemblance to his biological father. Appellant exhibited this anger outwardly by improperly handling the newborn victim. Further, the victim constantly cried around the Appellant, the only outward sign of distress the victim could communicate at such a young age. In addition, when interviewed by police, Appellant distanced himself from care of the victim, stating that when [Mother] was at school, it was [Maternal Grandmother] who only cared for the victim. Evidence was presented to refute these statements. Finally, after the victim was treated for the injuries, Appellant stated that he may have handled the victim too roughly and that he did not know his own strength. This evidence, when viewed in the light most favorable to the

Commonwealth, supports the finding that Appellant was the cause of the victim's injuries.

Trial Court Opinion, 7/14/2014, at 10.

In concluding that the trial court's findings are supported by the record, "we must keep in mind that '[t]he credibility of witnesses and the weight to be accorded the evidence produced are matters within the province of the trier of fact, who is free to believe all, some or none of the evidence.'" *Commonwealth v. Vining*, 744 A.2d 310, 320 (Pa. Super. 1999) (quoting *Commonwealth v. Perez*, 698 A.2d 640, 645 (Pa. Super. 1997)). "We are cognizant of the difficulties often facing the prosecution in cases of child abuse. Typically in such cases one finds, as here, the only witnesses to the events that transpired are a young victim and the alleged perpetrators." *Vining*, 744 A.2d at 320.

In this case, the victim, being only seven weeks old at the time, could not speak for himself. Nonetheless, Mother and Maternal Grandmother both testified about the victim being upset around Appellant, as well as Appellant's rough handling of the victim. For example, Mother testified that one morning, after Appellant had gotten up with the victim during the night, Mother noticed a small bruise on the victim's face under his eye. N.T., 1/13/2014, at 101. Mother also testified that one time after Appellant changed the victim's diaper, the victim was crying and Appellant "thrusted him very aggressively into [her] hands." *Id*. at 105. Maternal Grandmother

testified that when Appellant was alone caring for the victim, he would be crying inconsolably. *Id*. at 204. Maternal Grandmother would then go into the basement to get the victim. Maternal Grandmother further testified that Appellant handled the victim inappropriately. *Id*. at 206.

Based on this testimony, a jury could reasonably infer that Appellant was the perpetrator of the victim's child abuse. It is clear that the jury believed the testimony of Mother and Maternal Grandmother that it was Appellant that caused the victim's injuries. *See Pettyjohn*, *supra* ("Any doubt about the defendant's guilt is to be resolved by the fact finder…"). Accordingly, we hold the evidence was sufficient to sustain Appellant's conviction for aggravated assault.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.

Prothonotary

Date: <u>1/13/2015</u>