COMMONWEALTH of Pennsylvania,
Appellant,

v.

R.P.S., Appellee.

Superior Court of Pennsylvania.

Argued March 18, 1999.
Filed July 13, 1999.
Reargument denied Sept. 16, 1999.

J. Karen Arnold, Asst. Dist. Atty., Bellefonte, for Com., appellant.

Anthony M. Mariani, Pittsburgh, for appellee.

Before CAVANAUGH, HUDOCK and HESTER, JJ.

HESTER, J.:

¶ 1 The Commonwealth appeals from the April 8, 1998 order wherein the trial court concluded that the minor victim in this case, L.T., was not competent to testify. We affirm.

¶ 2 The factual background of this case follows. Appellee is the stepfather of L.T. L.T. and his sister are the natural children of M.T. and D.T.S., Appellee's wife. At the time of the alleged criminal incident, M.T. and D.T.S. were involved in a bitter custody suit involving L.T. and his sister. In its brief, the Commonwealth indicates that M.T. is a police officer. Commonwealth's brief at 38.

¶ 3 On October 21, 1996, Appellee was charged with involuntary deviate sexual intercourse, endangering the welfare of a child, corruption of minors and indecent assault. He was accused of abusing the victim over a period of approximately two years. He also was accused of placing his penis in the victim's mouth on August 9, 1996, while they were in the shower together. In August 1996, L.T. was four and one-half years old.

¶ 4 In the same time frame as when these criminal proceedings were instituted, a report of suspected abuse for the August 1996 incident was made to Centre County Children and Youth Services ("CYS"). In fact, prior to August 1996, four complaints of suspected abuse had been made to CYS concerning L.T. and Appellee, and CYS had determined that all four were unfounded. With respect to this new, fifth complaint, dependency proceedings were instituted by CYS, and CYS engaged the services of Dr. Arnold Shienvold, a clinical psychologist and forensic examiner, so that he could independently evaluate the child. Dr. Shienvold never was hired by Appellee with regard to these criminal proceedings or the dependency proceedings. Dr. Shienvold issued a report on March 5, 1997. As a result, a hearing occurred, and the testimony of the doctor was heard. CYS then withdrew its petition for dependency.

¶ 5 Appellee then moved for a competency hearing regarding L.T. in these criminal proceedings, and the competency hearing was held on October 1, 1997. On April 8, 1998, the trial court entered an order declaring L.T. incompetent to testify.[1] The Commonwealth filed this appeal.

¶ 6 The issue before us is whether the trial court erred in determining that

---

1. The Commonwealth implies that these proceedings were somehow improper. We are puzzled by this implication since the trial court always determines whether a witness is competent before a witness is permitted to testify before a jury. Whether this determination occurs at trial or in pretrial proceedings is irrelevant to the propriety of the determination.

L.T. was not competent to testify. We examine this question under the following standards. The competency of a witness is presumed, but where the witness is under fourteen years of age, the court must conduct a searching inquiry as to mental capacity. *Commonwealth v. McMaster*, 446 Pa.Super. 261, 666 A.2d 724 (1995). A child witness is competent to testify if the child possesses:

(1) such capacity to communicate, including as it does both an ability to understand questions and frame and express intelligent answers, (2) *mental capacity to observe the occurrence itself and the capacity of remembering what it is that she is called to testify about, and* (3) a consciousness of the duty to speak the truth.

*Id.* 666 A.2d at 727 (quoting *Rosche v. McCoy*, 397 Pa. 615, 620–21, 156 A.2d 307, 310 (1959)) (emphasis added).

█ ¶ 7 A trial court deciding on the competency of a child witness is torn by conflicting policies. *Id.* On the one hand, justice must not be denied merely because a case rests on the testimony of a young child while on the other hand, children are susceptible to suggestions and fantasy. *Id.* In light of the problems faced by the trial court, our standard of review regarding rulings on the competency of witnesses is extremely limited. *Id.* "[T]he determination of competency is a matter for the sound discretion of the trial court, which will not be disturbed absent a clear abuse of that discretion." *Id.* (quoting *Commonwealth v. Hart*, 501 Pa. 174, 177, 460 A.2d 745, 747 (1983)). Indeed, competency rulings by the trial court will not "be reversed except for a 'flagrant abuse of discretion.'" *Id.* (quoting *Commonwealth v. Mangello*, 250 Pa.Super. 202, 378 A.2d 897, 898 (1977)).

█ ¶ 8 At the beginning of the competency hearing, L.T. was interviewed in chambers. That interview unquestionably establishes that L.T. has the ability to understand questions and frame somewhat appropriate answers. The child also clearly understood the difference between the truth and a lie. However, he seemed unable to understand his duty to tell the truth, as the following exchanges with the trial court indicate:

Q. What would happen if you told a lie?

A. My nose would grow.

Q. Is that the only thing?

A. No.

Q. What else would happen?

A. I would get in trouble.

Q. What kind of trouble would you be in?

A. I don't know.

Q. Who told you you would be in trouble?

A. I don't know.

Q. But do you think you could be punished if you told a lie?

A. I don't know.

Q. Who would punish you, L.T., if you told a lie?

A. I don't know. I don't know who would.

Q. Has anybody ever told a lie to you, do you know?

A. No.

Q. Have you ever lied to anybody? Did you ever do that?

A. No.

Q. You have never told a lie?

A. No.

Q. Okay. But did you know Amber to ever tell a lie?

A. No.

Q. She's never told a lie. You think she's always told the truth?

A. Yeah.

Q. To you anyway. That's good. If I tell you right now that I'm a duck, would that be the truth or a lie?

A. A lie.

Q. That I'm a duck?

A. I wanted to knock it down.

Q. All right. Well you be careful.

A. My feet, my socks are sticking to the carpet.

Q. L.T., if I told you that I was a duck, would that be a truth—

A. A lie.

Q. —or a lie?

A. A lie.

Q. A lie. Okay. Are some lies okay to tell and some lies not okay to tell?

A. I don't know.

Q. Okay. Do you think as a judge if somebody told a lie in the courtroom that I would do something to punish them?

A. I don't know. How come the flags around up—

Q. They are.

A. Don't—

Q. Why they aren't up at the top of a big flagpole?

A. Yeah.

Q. Because that's all the longer the pole is.

N.T. Competency Hearing, 10/1/97, at 19–20.

¶ 9 Following this interview, the trial court took testimony from Dr. Arnold T. Shienvold. The Commonwealth repeatedly suggests that the trial court improperly relied upon the testimony of Dr. Shienvold to determine that L.T. was not credible. This suggestion is completely unfounded. The trial court stated, "the evidence presented by Defendant demonstrated to this Court that L.T. does not possess the capacity to remember the alleged incidents about which he would be called to testify. Consequently, pursuant to the well-established standard for determining the competency of a child to testify, this Court is compelled to conclude L.T., age six (6), is not a competent witness." Trial Court Opinion, 7/2/98, at 2. The trial court never rendered an opinion about L.T.'s credibility, merely his capability of remembering the alleged abuse.

¶ 10 In making this determination, the trial court relied upon Dr. Shienvold's opinion that the child could not remember the events *as well as* an audiotape of an interview of L.T. by Lisa Himes of CYS conducted on August 9, 1996, and a videotape of an interview conducted by M.T. and his attorney, Samuel Rizzo, the following day. The Commonwealth has failed to include in the record certified to us a copy of the audiotape and videotape, despite the fact that the tapes specifically were introduced into evidence at the competency hearing and made part of the record herein. This failure alone warrants affirmance herein. Nonetheless, the trial court has stated that the tapes indicate the following, and we accept its characterization of recital of their contents:

Regarding Himes's interview techniques, Himes's audiotape interview of L.T. on August 9, 1996, consists of suggestive, leading questions which do not permit L.T. to rely on his independent recollection. Himes began the interview by instructing L.T. to "tell me what you told your dad." [Hearing Transcript, April 29, 1997, p. 24.] L.T. responded he could not remember and repeatedly advised Himes to, "Get my dad. He can tell you the whole thing. *I don't remember any of this stuff.* Go ask my dad. Ask him to help." *Id.* at 25. At no point during the interview did L.T. describe any conduct by Defendant. *Id.* at 28.

As the interview progressed, Himes repeated questions when L.T. did not initially respond with the desired answer. For instance, Himes asked L.T. if he touched Defendant's private parts with his hands and if Defendant touched L.T.'s. L.T. responded, "No," and then when Himes asked the question a second time, L.T. responded, "Yes." *Id.* at 29.

M.T., the natural father of L.T. and his sister, . . . and Attorney Samuel Rizzo, M.T.'s attorney, conducted a videotape interview of L.T. on the following

day, August 10, 1996. Instead of asking L.T. what happened on the date in question, Attorney Rizzo initiated the interview by asking L.T. to tell him what L.T. had told Lisa Himes. As during Himes's interview of L.T., at no point during this interview was L.T. asked to describe Defendant's alleged conduct. Further, M.T. encouraged L.T. to respond quickly by advising him, "This is our one chance," and "[T]ell us so we can play 'Freddy Fish' on the computer." In addition, throughout this interview session, L.T. contradicted statements he made the day before when he was interviewed by Himes, but those contradictions were not explored. *Id.* at 36.

Trial Court Opinion, 7/2/98, at 3–4 (emphasis added).

¶ 11 At the competency hearing, Appellee presented the testimony of Dr. Shienvold who, as noted, was hired by CYS to review this case independently for purposes of the dependency hearing and never was employed by Appellee. Dr. Shienvold opined that L.T. does not remember any purported abuse. His testimony is clear and convincing.

¶ 12 In rendering his opinion, Dr. Shienvold indicated that he relied upon the following:

I reviewed Centre County records. I reviewed hearing transcripts. I reviewed the transcripts of L.T.'s own testimony. I reviewed an audio tape of a Miss Lisa Himes interviewing L.T. and of M.T. interviewing L.T. within that same audio tape with Lisa Himes. I reviewed a videotape of M.T. and Mr. Sam Rizzo, his attorney, interviewing L.T. I believe the next day with respect to that. I had reviewed *other records* that were sent to me as listed on here, on this report.

Having listened to those and reviewed some of those records I was dismayed at both what I read in the records about the complexity of the case. *This was not a case where there was a spontane-*

*ous admission of or revelation of a sexual abuse by a child.* This was a very complex custody, long-term custodial conflict that included multiple allegations of physical abuse preceding this allegation of sexual abuse.

There were protection from abuse orders in the history of this case as I reviewed it and then there was especially in initial interview [of L.T.], *the interview by Lisa Himes with M.T. [in the room] that was so abnormal in terms of a protocol for doing a sexual abuse allegation interview.*

. . . .

*That that was such a deviation and I believe such a poor interview style* and then following that up with another attempt at an interview within 24 hours of again L.T. by M.T.'s attorney that was actually videotaped but again with M.T. in the room and M.T. participating in the interview that I had significant concerns not only regarding the specifics of the interview and the specifics of the interview style but of just what was the whole context of this and what was going on.

It was at that point that I said that it would be helpful for me to be able to interview M.T., to interview [D.T.S.] and actually I requested the ability to interview [Appellee] and to also make available [L.T.'s sister] and L.T. for the possibility of interviews and then follow through with that process then.

I interviewed M.T. I interviewed [L.T.'s mother]. I did not interview [Appellee]. He was advised not to be involved in the interview process. Melinda Eash from my office interviewed L.T. and [his sister] which is a common practice in our office to use a team approach in dealing with sexual abuse allegations and based on all of those sources, all the sources that I have talked about I came up with the opinion that I have voiced in this courtroom and also written in the report.

N.T. Competency Hearing, 10/1/97, at 66–68.

¶ 13 Dr. Shienvold also stated that the August 9, 1996 interview by Ms. Himes evidenced extreme interviewer bias. He observed that Ms. Himes ignored negative answers given by L.T. during the interview and continued to ask the same questions. In addition, Ms. Himes talked into the recording device and purported to paraphrase the child's statement but actually gave a statement that was leading and more suggestive than the child's response. Ms. Himes also failed to explore any of the discrepancies in L.T.'s responses. Essentially, Ms. Himes knew what the allegations of abuse were before the interview and continually attempted to have the child reiterate those allegations by repeating questions, using leading questions, ignoring unwanted answers, and refusing to explore discrepancies.

¶ 14 Dr. Shienvold also observed that M.T. entered the room during the August 9, 1996 interview, and then Ms. Himes and M.T. together began "to try and coerce and intimidate L.T. into other disclosures" to the point that L.T. became "upset." *Id.* at 77. They suggested that L.T. repeat "dirty words" that Appellee had used, and when L.T. could not recall any, asked him to search for them by suggesting that the words that Appellee used rhymed with truck and duck. *Id.* L.T. still could not recall any dirty words used by Appellee.

¶ 15 Dr. Shienvold noted that during another interview M.T. conducted and recorded with L.T., M.T. was very "intimidating" and "coercive" with the child. *Id.* at 78. The doctor also was troubled by a series of notes M.T. produced for CYS that M.T. entitled "documentation of abuses of" L.T. *Id.* The notes indicate that M.T. would "routinely question [L.T. and his sister] at the beginning of every visit about what sort of bad things [Appellee] had done to them." *Id.* at 79. M.T. admitted that he did not like Appellee, that he told that to the children on "a consistent basis," and that he told the children that Appellee was the devil or "devilish." *Id.*

¶ 16 Dr. Shienvold noted the following about such behavior:

[W]hen a child is exposed repeatedly from a very important loved one, a very important person to this constant character description of somebody being bad, the child begins if he's lucky to get only ambivalent about his own feelings about that person. It can go much further and become totally alienated and hardened feelings about that person that the person is bad and then the child will interpret behaviors, relatively neutral behaviors of that individual as bad behaviors.

And that's why quite often there is within custody cases there's a lot of confusion about benign interactions that become allegations of abuse in some way. Spankings become beatings, washing somebody during a bath becomes a sexual abuse allegation because it fits the overall scheme that the child has begun to develop. Now there's a term for that in the research literature of stereotypic induction.

Q. Could you describe maybe for those of us who haven't studied as you have and worked as you have what stereotypic induction is?

A. Stereotypic induction means that you induce a specific type of stereotype into a child's mind. You set the stage. The experiments on it are that you set the stage about a particular event or individual by telling the child this person is very bad. This person does silly things. This person does stupid things, whatever it may be. You have the person come in and you do something relatively neutral and then ... ask the child questions about that event and the child will interpret them as negative events and if you start feeding a little bit of misinformation to the child given the child's age they'll embellish that event into something even worse than it was. That's stereotypic induction.

In that context of this case I believe you have a situation where there has been this ongoing situation of M.T. interviewing these kids on a consistent basis and implying to them how bad their stepdad is. I mean when M.T. told me about how he interviewed L.T. on the day he was driving him to Lisa Himes' office, he stopped the car and he took him out, or the truck. He took him outside of the truck and L.T. even in his own words was slow to disclose. I mean there was no accidental statement of abuse. L.T. didn't say anything about abuse. M.T. who describes himself to me as a very intuitive person intuitive that his son had been abused that day because he was wet and he began to question L.T. L.T. initially didn't disclose and then M.T. said to me, well I told him that I knew something bad had happened; that I knew he had been hurt by [Appellee] and that if he really wanted to be protected by me he needed to tell me what it was. And then this evolved in this whole conversation about this game of guns in the shower which is a whole separate conversation about the interviewing around this game of guns.

But in any case it was just the ongoing aspect of putting L.T. in the situation of tell me something negative about him. I will protect you. He's a bad person. He hurt you and then if L.T. says something L.T. begins to particularly believe that that may have been a bad thing that happened. Whether it was or not we don't know.

. . . .

You see I think the problem here is *L.T. is incapable of distinguishing real from unreal. It's not truth from lies. It's real from unreal. His memory is [affected] by this.*

I mean if he was 50 years old and in a different situation we would be talking about psychosis versus non-psychosis, of real versus unreal. L.T. can't distinguish that. At four and a half years old—it's not simply that he has two al-

ternate sets of memory. *It's that his memory has been changed* as a function of suggestion and as a function of leading and that can happen with four and a half year olds.

*Id.* at 80–82 (emphases added). Later, Dr. Shienvold repeated, "I believe that L.T.'s memory of events has been permanently distorted." *Id.* at 83.

¶ 17 Significantly, Dr. Shienvold reported that when L.T. was interviewed by his office, L.T. could not remember any abuse. He explained that when his office interviewed L.T., there were no "cues" in the interview room, that the interview was completely "open-ended," and that L.T. "denied everything." *Id.* at 84. Dr. Shienvold stated that during the interview with his office, L.T. *"said nothing happened, nothing happened." Id.* (emphasis added).

¶ 18 Dr. Shienvold further observed that M.T. continued to add different allegations as the dependency proceeding progressed and that M.T. attributed L.T. with using words that a child of his age would not use. Specifically, M.T. told CYS that at the age of two, L.T. told him that he did not want to live with his mother and stated that this "is my life and I'll make a decision." *Id.* at 85. Dr. Shienvold observed that two year old children do not use such concepts while speaking.

¶ 19 Dr. Shienvold interviewed people collateral in L.T.'s life to determine if he exhibited behavior indicating that he had been traumatized. The doctor interviewed two of L.T.'s preschool teachers and a therapist who was involved with L.T. in the past. He summarized the results of those interviews:

Consistently from those individuals I received reports, actually two important areas. Number one, is that L.T. showed no behaviors that indicated traumatization. He shows no sexualized behavior, meaning that he interacted appropriately with his peers, with the other children in these classrooms. He didn't exhibit

any undue touching, fondling, any attempts at modeling or utilizing behaviors that were consistent with the types of things that he said he was exposed to. He also did not use any language that was either sexualized language or language that was just found, vulgar language, that the teachers were concerned about to any inappropriate degree.

*Id.* at 86. Finally, Dr. Shienvold observed that L.T. never had made a spontaneous complaint of child abuse.

¶ 20 As the above clearly indicates, the trial court's conclusion that L.T. is not capable of remembering the abuse is more than supported by this record. The court did not flagrantly abuse its discretion in determining the child is not competent to testify. In its brief, the Commonwealth refuses to acknowledge the soundness of the trial court's decision, the persuasiveness of Dr. Shienvold's testimony, and that the court's decision also rested upon the statements of L.T. during the Himes interview that he does not remember abuse and his statements to Dr. Shienvold's associate that it did not occur.

¶ 21 The Commonwealth proffers a variety of reasons in support of its position that the trial court was not permitted to rely upon the testimony of Dr. Shienvold in rendering its decision. Without directly asserting that Dr. Shienvold was not qualified to render an expert opinion on the issue, it launches a lengthy diatribe against him, casting aspersions regarding his credentials and work experience and implying that it was somehow unethical for him to ask an associate to interview the child. Our review of the record, however, establishes that Dr. Shienvold was qualified to evaluate the child and determine whether he was capable of remembering the abuse. We also do not see any problem with the fact that his amply qualified associate conducted the interview with L.T.

■ ¶ 22 The Commonwealth also insinuates that the trial court committed grave error in relying upon reports, interviews, and documents from the dependency proceedings. Not only were the majority of these documents introduced without Commonwealth objection, they unquestionably were relevant to ·the child's competency and properly were admitted in these criminal proceedings.

■ ¶ 23 In addition, the Commonwealth argues *ad nauseum* that Dr. Shienvold improperly rendered an opinion as to the credibility of L.T. and that the trial court was not permitted to rely on that opinion under such cases as *Commonwealth v. Dunkle,* 385 Pa.Super. 317, 561 A.2d 5 (1989) and *Commonwealth v. Seese,* 512 Pa. 439, 517 A.2d 920 (1986), which concern the prohibition against testimony by an expert witness that suggests to the jury that a witness is credible.

■ ¶ 24 The Commonwealth completely misses the mark in leveling this argument. Credibility was not the issue; competency was. As noted, competency is a question of law for the trial court. The trial court herein was required to ascertain whether the child was capable of remembering the alleged abuse and communicating it to the jury. Dr. Shienvold's testimony went to that issue. The trial court is permitted to order psychiatric testimony on the issue of the competency of a witness. *See Commonwealth v. Garcia,* 478 Pa. 406, 387 A.2d 46, 55 (1978) (majority of the court agreeing with this portion of the holding). Indeed, testimony from expert witnesses is used regularly on issues regarding competency in this Commonwealth in civil and criminal proceedings. The testimony was not infirm under the cases relied upon by the Commonwealth.

¶ 25 The Commonwealth further suggests that Dr. Shienvold's testimony was not scientifically reliable. We are puzzled by this argument. Evidence from psychologists and psychiatrists is routinely accepted in this Commonwealth, from the prosecution and the defense. The fact that the Commonwealth does not like the conclusion of the expert witness does not render his opinion evidentiarily infirm. The Com-

monwealth was free to proffer the testimony of an expert witness in rebuttal to Dr. Shienvold and was aware of his conclusions regarding L.T.'s competency well before the hearing in this action.

¶ 26 Order affirmed. Case remanded. Jurisdiction relinquished.