800 A.2d 965 (2002)
COMMONWEALTH of Pennsylvania, Appellant,
v.
D.J.A.
Superior Court of Pennsylvania.
Argued February 19, 2002.
Filed June 5, 2002.
*967 Kenneth A. Zak, Asst. Dist. Atty., Erie, for Com., appellant.
Timothy J. Lucas, Erie, for appellee.
Before: DEL SOLE, P.J., JOHNSON, HUDOCK, FORD ELLIOTT, ORIE MELVIN, LALLY-GREEN, TODD, BENDER, and BOWES, JJ.
*966 FORD ELLIOTT, J.
¶ 1 The Commonwealth asks us to determine whether the trial court abused its discretion when it found a seven-year-old girl, "A.A.", incompetent to testify in a criminal action involving child sexual abuse. We are also asked to decide whether the trial court abused its discretion when it found A.A.'s statement to her physician implicating defendant/appellee as the perpetrator of the alleged abuse inadmissible *968 pursuant to Pa.R.E. 803(4), 42 Pa.C.S.A. We affirm in part and reverse in part. Our reasons, and a brief statement of the facts of this case, follow.
¶ 2 From October 1996 through June 1997, appellee, A.A.'s father, had physical custody of A.A. and her two siblings, who resided with appellee and his paramour. On June 16, 1997, Child Protective Services received a report of suspected child abuse, alleging that appellee had fondled A.A.'s vaginal area and buttocks on more than one occasion and had physically hurt her. Child Protective Services sent the report to Erie County Children and Youth Services ("CYS"), whose case worker, Amy Hoffman, conducted four interviews with A.A., three of which were tape recorded. Ms. Hoffman also interviewed A.A.'s siblings.
¶ 3 On September 11, 1997, Dr. Justine Schober, a pediatric urologist, examined and interviewed A.A., who made the same disclosures to Dr. Schober that she had made to Ms. Hoffman. Dr. Schober's physical examination revealed evidence of anal penetration but no evidence of vaginal penetration. CYS then referred the case to the Pennsylvania State Police, which filed criminal charges against appellee on April 2, 1998, setting forth counts of rape, involuntary deviate sexual intercourse ("IDSI"), indecent assault, corruption of minors, and endangering the welfare of children.[1]
¶ 4 On April 20, 1998, A.A., by then age six, testified at appellee's preliminary hearing concerning the allegations of abuse. Following the hearing, appellee was held over for trial. The Commonwealth then filed an information setting forth the counts enumerated above, and the case was eventually scheduled for trial in February 2000. On February 4 and 7, 2000, the trial court held a hearing to determine whether A.A. was competent to testify at trial; and on February 8th, the court ruled from the bench that A.A., who by then was almost eight years old, was incompetent to testify.
¶ 5 The Commonwealth next presented the court with Dr. Schober's interview of A.A. by way of an offer of proof. The court precluded the Commonwealth from introducing testimony concerning the identity of the alleged perpetrator. This timely appeal followed, in which the Commonwealth raises the following issues:
A. DID THE TRIAL COURT ERR IN EXCLUDING FROM EVIDENCE THE CHILD VICTIM'S TESTIMONY BASED ON INVESTIGATIVE INTERVIEWS CONDUCTED OF THE CHILD AND THE CHILD'S TESTIMONY AT THE PRELIMINARY HEARING?
B. DID THE COURT ERR IN CONSIDERING AND ENTERTAINING THE TESTIMONY BY AN EXPERT WITNESS PROFFERED BY THE DEFENSE ON INTERVIEWING TECHNIQUES OF THE CHILD AND YOUTH SERVICES WORKER WHO INVESTIGATED ALLEGATIONS OF ABUSE RATHER THAN BASE ITS COMPETENCY DECISION ON THE QUESTIONING OF THE CHILD WITNESS HERSELF BY THE COURT?
C. DID THE COURT ERR IN EXCLUDING THE TESTIMONY OF AN EXAMINING PHYSICIAN CONCERNING STATEMENTS BY THE CHILD AS TO THE *969 IDENTITY OF THE ALLEGED PERPETRATOR, STATEMENTS THAT WERE MADE BY THE CHILD IN THE COURSE OF A MEDICAL EXAMINATION AND WERE OFFERED BY THE COMMONWEALTH UNDER THE MEDICAL TREATMENT EXCEPTION TO THE HEARSAY RULE?
Commonwealth's brief at 4.
¶ 6 As this court recently observed:
`Our standard of review of rulings on the competency of witnesses is very limited indeed. As one Pennsylvania commentator has stated it, such rulings by trial judges will not be reversed except for a "flagrant abuse of discretion." 2 Henry, Pennsylvania Evidence § 790 (1953). Professor Wigmore goes further still in suggesting that appellate courts should virtually never disturb such rulings; it is preferable, he argues, to accept the testimony for what it is worth and leave the matter of credibility to the fact-finder. IV Wigmore on Evidence § 1821 (Rev. ed.1976). See also ALI, Model Code of Evidence, Rule 101 & p. 340 (1942).'
Commonwealth v. McMaster, 446 Pa.Super. 261, 666 A.2d 724, 727 (1995), quoting Commonwealth v. Mangello, 250 Pa.Super. 202, 378 A.2d 897, 898-899 (1977) (other citations omitted). McMaster's citation to Wigmore clearly indicates that a finding of competency is the rule, with credibility being a separate issue for the fact-finder.[2]
¶ 7 When ruling on the competency of a witness, the following principles should guide the court:
`[C]ompetency of a witness is presumed, and the burden falls on the objecting party to demonstrate incompetency. Rosche v. McCoy, 397 Pa. 615, 156 A.2d 307 (1959); Commonwealth v. Mangello, supra. When the witness is under fourteen years of age, there must be a searching judicial inquiry as to mental capacity, but discretion nonetheless resides in the trial judge to make the ultimate decision as to competency.'
Id., quoting Commonwealth v. Short, 278 Pa.Super. 581, 420 A.2d 694, 696 (1980) (other citation omitted). In making its determination, the court must inquire whether the child possesses:
`(1) such capacity to communicate, including as it does both an ability to understand questions and to frame and express intelligent answers, (2) mental capacity to observe the occurrence itself and the capacity of remembering what it is that she is called to testify about and (3) a consciousness of the duty to speak the truth.'
Id., quoting Rosche, supra at 620-621, 156 A.2d at 310 (other citations omitted).
¶ 8 In 1998, the supreme court adopted the Pennsylvania Rules of Evidence, including Rule 601, Competency, which provides:
Rule 601. Competency
(a) General Rule
Every person is competent to be a witness except as otherwise provided by statute or in these Rules.
(b) Disqualification for Specific Defects
A person is incompetent to testify if the Court finds that because of a mental condition or immaturity the person:
(1) is, or was, at any relevant time, incapable of perceiving accurately;
*970 (2) is unable to express himself or herself so as to be understood either directly or through an interpreter;
(3) has an impaired memory; or
(4) does not sufficiently understand the duty to tell the truth.
Pa.R.E. 601, 42 Pa.C.S.A. The Comment to Rule 601 indicates that Rule 601(b) is consistent with Pennsylvania decisional law concerning the competency of, inter alia, children of tender years. Comment 1998, citing Rosche, supra.
¶ 9 The trial court, when making a determination of competency, is confronted by conflicting policies:
`One is that a party should not be denied justice because reliance necessarily must be placed upon the testimony of a child of tender years. But, on the other hand, experience has informed us that children are peculiarly susceptible to the world of make-believe and of suggestions. Care must be exercised to keep the balance true as between these conflicting claims.'
McMaster, 666 A.2d at 727, quoting Rosche, supra at 621, 156 A.2d at 310.
¶ 10 Therefore, "`[t]he determination of competency is a matter for the sound discretion of the trial court, which will not be disturbed absent a clear abuse of that discretion.'" Id., quoting Commonwealth v. Hart, 501 Pa. 174, 177, 460 A.2d 745, 747 (1983) (other citations omitted). See also Commonwealth v. Delbridge, 771 A.2d 1, 6 (Pa.Super.2001), appeal granted in part, 566 Pa. 618, 783 A.2d 764 (2001); and Commonwealth v. R.P.S., 737 A.2d 747, 749 (Pa.Super.1999) (quoting and citing McMaster with approval). An abuse of discretion is " `[n]ot merely an error of judgment, but if in reaching a conclusion, the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will as shown by the evidence or the record, discretion is abused.'" Commonwealth v. Long, 533 Pa. 388, 395, 625 A.2d 630, 634 (1993), quoting Kelly v. County of Allegheny, 519 Pa. 213, 217, 546 A.2d 608, 610 (1988) (other citation omitted). Most fundamentally, a trial court's judgment is manifestly unreasonable, and therefore an abuse of discretion, if it does not find support in the record.
¶ 11 In this case, the trial court found A.A. incompetent to testify. (Notes of testimony, competency hearing, 2/8/00 ("February 8th hearing") at 9.) The court reached its conclusion by applying the standard enunciated in Rosche, supra, R.P.S., supra, and McMaster, supra, and set forth in Rule 601, especially Rule 601(b)(1). A.A. was almost eight years old when she testified at the competency hearing in 2000, but was only five years old when Ms. Hoffman interviewed her in the summer of 1997. While the trial court observed that during its interview with A.A. at the competency hearing, the court "focus[ed] on the present tenseis the child at the present time competent[,]" the court never specifically determined whether A.A. was competent at the time of the competency hearing. (February 8th hearing at 8-9.)
¶ 12 Our review of A.A.'s testimony at the February 4, 2000 competency hearing leaves little doubt that she was competent at that time. (Notes of testimony, competency hearing, 2/4/00 ("February 4th hearing") at 6-15.) Instead of relying on A.A.'s testimony in 2000, however, the trial court relied on the 1997 tapes and Rule 601(b)(1)'s requirement that the court determine whether A.A. "is or was at any relevant time incapable of perceiving accurately." As the trial court stated:
The best evidence we have in this case as to whether or not [A.A.] was able at *971 the time to perceive accurately are these early statements. And the Court finds that even in spite of the interview [of February 4, 2000] that was conducted, when you look at the totality of the evidence, the Court cannot sit here today and say that it feels by the quantum of evidence required that this is a child who was at the relevant time capable of perceiving accurately. In fact, the tapes themselves, not so much the transcripts, they are dry, but the tapes themselves belie that notion.
February 8th hearing at 9. The trial court then found that A.A. was incompetent to testify in 2000 based upon her responses to Ms. Hoffman's questions during the 1997 taped interviews.
¶ 13 While we commend the trial court, the Honorable Ernest J. DiSantis, Jr., for the thoroughness with whichhe addressed the difficult issue of child competency, we do not find support in the record for the trial court's conclusion. We agree with the trial court, however, that the language of Pa.R.E. 601(b)(1) requires a court to determine a child's ability to perceive accurately both at the time of the competency hearing and at any other relevant time. (February 8th hearing at 9.). "Any other relevant time" necessarily includes the time during which the events the child is describing occurred.
¶ 14 Like the trial court, we have listened to the tape recording of the 1997 interviews, which, we agree, is far more revealing than the transcripts. Unlike the trial court, however, we find that A.A.'s dialogue with Ms. Hoffman accurately reflects a five-year-old child's perception of the acts giving rise to the charges against her father. For example, very early in the interview, the following exchange occurs:
[MS. HOFFMAN:[3]] So what do we need to talk about? We going to talk about good touches and bad touches?
[A.A.:] Yeah.
[MS. HOFFMAN:] What's a good touch?
[A.A.:] Um, daddy used to do nice things. He used to, when we, he would get all our stuff when we needed it.
[MS. HOFFMAN:] Oh really?
[A.A.:] That was the good old days.
[MS. HOFFMAN:] Yeah, that was the good old days. Well, what happened, what happened that they aren't good anymore? (shuffling noise) What's that?
[A.A.] (whispering): He put (inaudible) in my mouth.
[MS. HOFFMAN:] What did he put
[A.A.:] Private area in my mouth.
[MS. HOFFMAN:] Can you say (whisper by Ms. Hoffman) so we can hear it?
[A.A.:] [shouting] I said Daddy put his private area in my mouth.
[MS. HOFFMAN:] Daddy put his private area, okay. Now, what, what is his private area? What do we call that?
[A.A.:] The front private area right there.
[MS. HOFFMAN:] Does it have a name?
[A.A.:] Pee-pee.
[MS. HOFFMAN:] Okay, so you're telling me that daddy put his pee-pee in your mouth. Okay, what happened when he did that?
[A.A.:] I throwed up.
[MS. HOFFMAN:] You threw up? Why did you throw up? *972 [A.A.:] [emphatically] Because he put his private area in my mouth.
Transcript of audiotaped interviews, 2-4.[4]
¶ 15 If A.A. had not spoken another word during the interviews, the preceding answers to Ms. Hoffman's questions would have been enough to indicate that A.A. was "capable of perceiving accurately" what her father allegedly did to her. While we have no doubt that A.A. did not fully grasp the heinous nature of the acts she describes, such comprehension is not relevant to a determination of competency. Furthermore, as the preceding excerpt clearly indicates, Ms. Hoffman did not prompt A.A. to answer the questions in any particular fashion. The tape recording also indicates that Ms. Hoffman asked her questions in a neutral tone of voice throughout the interview, saying "okay" only to acknowledge she understood what A.A. was saying.
¶ 16 We recognize that A.A.'s mind wandered from the subject of the interview on numerous occasions, turning to her cats and dogs, for example. (Id. at 6-7.) We also recognize that many of A.A.'s responses to Ms. Hoffman's questions lay somewhere between the whimsical and the nonsensical. For instance, A.A. told Ms. Hoffman that her father's pee-pee went in her tummy, and that he tried to get it out but it was stuck in her private area. (Id. at 8.) Trying to clarify what happened, Ms. Hoffman asked, "What was stuck in your private area?" (Id. at 8-9.) A.A. responded "Daddy." (making sounds). (Id. at 9.) Ms. Hoffman then asked, "Oh, he was trying to get it out but it was stuck?" (Id.) In response, A.A. said, "Yes. Winnie the Pooh gets spots on him. Look it, look at his" (inaudible). (Id.)
¶ 17 Like the defense psychological expert who testified at the competency hearing, we recognize in these verbal excursions the fairly commonplace inability of a young child's mind to stay focused on any one topic for an extended period of time. This is especially true when the topic is as unpleasant as these interviews must have been for A.A. Nevertheless, we are convinced that while A.A. was no doubt better able to express herself when she was almost eight years old, even at age five she was aware of and able to describe the physical acts her father had allegedly performed on her, and also knew the difference between the truth and a lie. (Id. at 11-12, 40-41.)
¶ 18 As noted supra, however, the court never really explored A.A.'s competency at the time of trial, having concluded that Ms. Hoffman's suggestive interviewing techniques in 1997 tainted A.A.'s recollection of the events giving rise to the charges against her father. Furthermore, our review of the trial court's analysis of the 1997 interviews leads us to agree with the Commonwealth that the testimony of the defense expert, Melvin Jacob Guyer, Ph.D., regarding suggestive interviewing techniques influenced the court's assessment of those interviews. As the trial court acknowledged, it "considered all the evidence that was introduced during the course of [the competency] proceeding." (February 8th hearing at 2.) In addition to Dr. Guyer's testimony, this evidence included A.A.'s testimony at the competency and preliminary hearings, the tape recording of Ms. Hoffman's interviews with A.A. from 1997, and Ms. Hoffman's testimony concerning the interviews.
¶ 19 Nevertheless, Dr. Guyer testified over a period of two days, consuming 134 of the 215 pages of testimony transcribed *973 during those two days.[5] Dr. Guyer first set forth the ways in which improper interviewing technique can contaminate a child's memory so that the child no longer retains his or her own recollection of events, instead believing the events occurred as they emerged during the interviews. (February 4th hearing at 35-67.) Next, Dr. Guyer, using the research results he had discussed, critiqued Ms. Hoffman's interviewing technique in each of her interviews with A.A. (Id. at 72-103; notes of testimony, competency hearing, 2/7/00 ("February 7th hearing") at 3-34.) Finally, Dr. Guyer concluded, "I'm really quite confident that this child has been tainted...." (February 7th hearing at 34.) As Dr. Guyer acknowledged, however, whether a child's memory has been tainted is "an issue of trustworthiness." (February 4th hearing at 67.) The trial court at that point observed, "In my way of thinking, that's credibility. Whether you called it reliability or credibility, [Commonwealth v.] Dunkle says we can't go there." (Id.)
¶ 20 Despite the trial court's disclaimer, its analysis of the 1997 interviews when compared with Dr. Guyer's testimony evaluating the 1997 interviews indicates the impact of Dr. Guyer's assessment on the trial court's findings. Compare Dr. Guyer's testimony, February 4th hearing at 93-95 (stating, "To me, in my opinion, [Ms. Hoffman's interviewing technique from pages twenty-nine to thirty-one] suggests that the interviewer's focused on one and only one scenario, construes answers and follows answers only to be consistent with that [sic] there was sexual abuse, and that any information that runs counter to that is simply dropped[]"); with the trial court's findings, February 8th hearing at 7 (stating, "In fact, from roughly pages twenty-nine to thirty-one, the questions that were asked were, in fact, highly suggestive and represented a highly suggestive interviewing technique used by the caseworker."). Also compare Dr. Guyer's testimony, February 4th hearing at 95 (discussing A.A.'s description of her father hurting her with a light bulb by putting her whole body in it, and stating, "And then it goes into something that is, again, whimsical. I use that to mean fantastic in a child's ordinary way[ ]"); with the trial court's findings, February 8th hearing at 7 (discussing A.A.'s reference to the light bulb and describing it as "somewhat fantastic[]"). Finally, we note the trial court's agreement with Dr. Guyer that one of the "inaudible" words on the tape recording was, in fact, "Daddy."
¶ 21 We recognize that a court may allow expert testimony as to the competency of a witness. R.P.S., 737 A.2d at 754, citing Commonwealth v. Garcia, 478 Pa. 406, 425, 387 A.2d 46, 55 (1978). We also recognize the very fine line that exists between determining whether a child has "the mental capacity to observe the occurrence itself and the capacity of remembering what it is that she is called to testify about," McMaster, 666 A.2d at 727, and determining whether a child's memory is reliable. Rule 601 addresses this issue to some extent by requiring the court to determine whether the child "is or was, at any relevant time, incapable of perceiving accurately." Pa.R.E. 601(b)(1).
¶ 22 Recognizing the existence of this fine line, some jurisdictions, including New Jersey, have allowed trial courts to conduct *974 "taint hearings" in cases in which the defendant produces "some evidence" that a child victim's accusations were the product of suggestive or coercive interview techniques. State v. Michaels, 136 N.J. 299, 320-321, 642 A.2d 1372, 1383 (1994). Under New Jersey law, once the defendant establishes sufficient evidence of unreliability, the burden then shifts to the State to prove by clear and convincing evidence that the child's statements are reliable. Id. (citation omitted).
¶ 23 It is clear from reading Michaels, however, that the New Jersey Supreme Court fully recognized that "assessing reliability as a predicate to the admission of in-court testimony is a somewhat extraordinary step." Id. (citations omitted). Moreover, even New Jersey does not allow the testimony of an expert at a taint hearing to "extend to or encompass the ultimate issue of credibility of an individual child witness." State v. Krivacska, 341 N.J.Super. 1, 775 A.2d 6, 27 (App.Div. 2001), cert. denied, 170 N.J. 206, 785 A.2d 435 (2001), citing Michaels, supra. The Pennsylvania Supreme Court has likewise been emphatic in holding that an expert may not testify as to the credibility of a witness's testimony. Commonwealth v. Dunkle, 529 Pa. 168, 182-184, 602 A.2d 830, 837-838 (1992) (citations omitted).
¶ 24 In this case, that is precisely what occurred. As we have already noted, Dr. Guyer's testimony addressed the trustworthiness of A.A.'s responses to Ms. Hoffman in light of the relevant research on tainted childhood memories. According to Dr. Guyer, Ms. Hoffman's interview technique tainted A.A.'s recollection of the events she was describing.[6]
¶ 25 Our supreme court in Dunkle and its progeny has, however, been unequivocal in rejecting expert testimony on the issue of credibility, another word, in the trial court's estimation and ours, for trustworthiness or reliability. (February 4th hearing at 67.) See Commonwealth v. Crawford, 553 Pa. 195, 202-206, 718 A.2d 768, 772-773 (1998) (collecting cases and finding inadmissible an expert's testimony that a witness's memories of events occurring 20 years ago could not be considered accurate to any degree which would obviate reasonable doubt); Commonwealth v. Simmons, 541 Pa. 211, 230, 662 A.2d 621, 630-631 (1995) (stating that expert opinion cannot be offered to intrude upon the jury's basic function of deciding credibility), stay granted, 542 Pa. 554, 669 A.2d 309 (1995), and cert. denied, 516 U.S. 1128, 116 S.Ct. 945, 133 L.Ed.2d 870 (1996); Commonwealth v. Spence, 534 Pa. 233, 245, 627 A.2d 1176, 1182 (1993) (holding that the testimony of a psychologist as to the effects of stress upon people who are called to make identifications was properly excluded); Dunkle, supra at 183, 602 A.2d at 837 (noting that in the final analysis, the reason for a child's delay in reporting sexual abuse must be ascertained by the jury and is based on the credibility of the child and the attendant circumstance of each case); Commonwealth v. Seese, 512 Pa. 439, 443, 517 A.2d 920, 922 (1986) (finding inadmissible testimony of a pediatrician that young children usually do not fabricate stories of sexual abuse).
¶ 26 In deciding the appropriateness of Dr. Guyer's testimony, we are mindful that Pennsylvania, unlike New Jersey, has not yet adopted the practice of conducting pre-trial taint hearings, an issue that is pending before our supreme court. Commonwealth *975 v. Delbridge, 566 Pa. 618, 783 A.2d 764 (2001). That court is therefore in the best position to define to what degree, if any, it will allow an expert such as Dr. Guyer to testify as to the trustworthiness of a child's post-interview memories in child sexual abuse cases. Assuming the supreme court approves the concept of taint hearings, it is also in the best position to determine whether such a hearing is an appropriate part of a competency determination pursuant to Rule 601(b)(1).
¶ 27 Therefore, with a full appreciation of the extremely limited scope of our review of a trial court's competency ruling, we are constrained to reverse.[7] Unlike the trial court, we find no support in the record, and in particular in the audiotape, for the court's conclusion that Ms. Hoffman's interview technique tainted A.A.'s recollection of the acts her father allegedly performed on her. We also find that the trial court improperly relied, at least in part, on inadmissible expert testimony in finding A.A.'s 1997 interviews tainted. We must therefore also conclude that the trial court abused its discretion when it found eight-year-old A.A. incompetent at the time of trial.
¶ 28 The Commonwealth next claims trial court error in finding inadmissible A.A.'s statements to Dr. Schober implicating appellee as the perpetrator of the alleged abuse. "[T]he admissibility of evidence is a matter addressed to the sound discretion of the trial court, and we may only reverse rulings on admissibility upon a showing that the trial court clearly abused its discretion." Commonwealth v. Vining, 744 A.2d 310, 317 (Pa.Super.2000), appeal denied, 564 Pa. 709, 764 A.2d 1069 (2000), citing Commonwealth v. Weber, 549 Pa. 430, 701 A.2d 531 (1997). As the Vining court continued, quoting our supreme court:
`The hearsay rule provides that evidence of a declarant's out-of-court statements is generally inadmissible because such evidence lacks guarantees of trustworthiness fundamental to the Anglo-American system of jurisprudence. Hearsay evidence is presumed to be unreliable because the original declarant is not before the trier of fact and, therefore, cannot be challenged as to the accuracy of the information conveyed. Exceptions to the hearsay rule are premised on circumstances surrounding the utterance which enhance the reliability of the contents of the utterance, and render unnecessary the normal judicial assurances of cross-examination and oath.'
Id., quoting Commonwealth v. Chamberlain, 557 Pa. 34, 39-40, 731 A.2d 593, 595-596 (1999) (other citations omitted.)
¶ 29 One of the exceptions to the hearsay rule is medical treatment exception, Pa.R.E. 803(4), which allows for the admission of statements made for purpose of medical diagnosis or treatment, regardless whether the declarant is available as a witness. Recently, our supreme court observed, "As early as 1884, this Court stated that `[n]othing is better settled than that statements of a patient to his physician, as to the character and seat of his sensations, made for the purpose of receiving medical advice, are competent evidence....'" Commonwealth v. Smith, 545 Pa. 487, 493, 681 A.2d 1288, 1291 (1996), quoting Lichtenwallner v. Laubach, 105 Pa. 366 (1884).
¶ 30 In 1972, the supreme court expanded the law to permit medical testimony regarding the cause of the injury as *976 well as testimony regarding the patient's symptoms and sensations. Id. at 493-494, 681 A.2d at 1291, citing Cody v. S.K.F. Industries, Inc., 447 Pa. 558, 566, 291 A.2d 772, 776 (1972). As the Smith court therefore opined:
Given these descriptions of the medical treatment exception, it becomes apparent that there are essentially two requirements for a statement to come within this exception. First, the declarant must make the statement for the purpose of receiving medical treatment, Lichtenwallner v. Laubach, and second, the statement must be necessary and proper for diagnosis and treatment, Cody v. S.K.F.

Id. at 493, 681 A.2d at 1291 (other citation omitted).
¶ 31 The Smith court then applied the relevant law to the facts before it. In Smith, paramedics transported a five-year-old child to the hospital after her mother heard her scream and found her sitting in a tub of scalding hot water. As the nurses were treating the child, they asked her what happened, to which the child responded, "Daddy turned on the hot water and daddy put me in the water." Id. at 490, 681 A.2d at 1289-1290. The Commonwealth sought to introduce this statement under the medical treatment exception, arguing that "the statement as to identity of the perpetrator of abuse is of significance for psychological and emotional treatment of the victim as well as for the protection of the child from future abuse." Id. at 495, 681 A.2d at 1292.
¶ 32 Rejecting this argument, the Smith court first reviewed cases addressing similar issues, including U.S. v. Iron Shell, 633 F.2d 77, 81-85 (8th Cir.1980) (statements identifying assailant "would seldom if ever" be related to diagnosis or treatment), cert. denied, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981); State v. Veluzat, 578 A.2d 93 (R.I.1990) (statement to physician, identifying father as sexual abuser does not help physician to diagnose or treat); Cassidy v. State, 74 Md.App. 1, 33-34, 536 A.2d 666, 682 (1988) ("[t]he identity of the person who inflicted the bruises, albeit perhaps of transcendent social importance, is not ordinarily of strictly medical importance"), cert. denied, 312 Md. 602, 541 A.2d 965 (1988), superseded by Rule as stated in Walker v. State, 107 Md.App. 502, 668 A.2d 990 (1995). Binder, Hearsay Handbook, § 6.05 at p. 184 ("[t]he general rule is that the identity of a person who inflicts harm on a patient is not reasonably pertinent to diagnosis or treatment of the patient's injuries."). Contra U.S. v. Renville, 779 F.2d 430 (8th Cir. 1985), and Goldade v. State, 674 P.2d 721 (Wyo.1983), cert. denied, 467 U.S. 1253, 104 S.Ct. 3539, 82 L.Ed.2d 844 (1984).
¶ 33 Next, although agreeing that the Commonwealth's argument was "at first blush, inviting[,]" the Smith court concluded that if it were to accept that argument, "everything said by the patient in the context of being questioned for the purposes of psychological treatment and diagnosis would be admissible under the medical treatment exception." Id. at 496, 681 A.2d at 1292-1293. Thus, the court in Smith "decline[d] to extend the medical treatment exception to statements of identification of an alleged abuser made in [the context of medical treatment.]" Id. at 496, 681 A.2d at 1293.
¶ 34 In this case, the Commonwealth attempts to distinguish Smith by arguing that sexual abuse cases are different from physical abuse cases because, in addition to the emotional scarring that occurs when a family member sexually abuses a child, the child is in danger of contracting a sexually transmitted disease as a result of the abuse. (Commonwealth's brief at 17.) Although we fully recognize both the physical *977 and psychological damage sustained by a child victim of sexual abuse, we cannot agree that the distinction the Commonwealth attempts to draw between this case and Smith is a valid one.
¶ 35 While sexual abuse carries with it the danger of contracting a sexually transmitted disease, a child's statement identifying the perpetrator cannot obviate that danger, nor can such a statement, standing alone, determine whether the child should be tested and/or treated for a sexually transmitted disease. Thus, we find no error in the trial court's finding the child's statement in this case inadmissible.
¶ 36 For all of the foregoing reasons, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion. Jurisdiction is relinquished.
¶ 37 Del Sole, P.J. files a Dissenting Opinion.
DISSENTING OPINION BY DEL SOLE, P.J.
¶ 1 I respectfully dissent. While I do not disagree with the Majority's statement of the law in this case, I cannot accept the Majority's ultimate conclusion that the trial court abused its discretion.
¶ 2 The Majority properly recognizes that it was appropriate under Pa.R.E. 601(b)(1) for the trial court to determine the child's ability to perceive accurately both at the time of the competency hearing and during the time when the relevant events occurred. The trial court found that at the time of the relevant events the child was unable to perceive accurately what occurred. Competency Ruling, 2/8/00, at 8-9. The trial court reached this conclusion based upon the early interviews of the child. The trial court recalled that the child did initially provide information about sexual activity regarding her father, but followed these statements immediately with responses which the court characterized as "simply [not] mak[ing] sense." Id. at 5. The trial court notes that the child was unable to stay focused on the questions and was extremely distracted. The trial court found that her train of thought was not coherent and that the child often repeated the statement made by the caseworker.
¶ 3 Upon review, I find support for these findings. The child provided the relevant statements inculpating her father in some type of sexual assault, but these statements were disjointed, and interspersed with unrelated statements. Even the Majority recognizes that the child's mind "wandered from the subject of the interview on numerous occasions" and that her responses were many times "somewhere between the whimsical and the nonsensical." Majority Opinion at 972. Because, as the Majority recognizes, there is support for the trial court's findings regarding the child's limitations, I do not believe we can find the trial court's ultimate conclusion to be an abuse of discretion.
¶ 4 The Majority cites to relevant law which instructs that an abuse of discretion is "[n]ot merely an error of judgment," rather discretion is abused only where the "judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will." Majority Opinion at 970, citing Commonwealth v. Long, 533 Pa. 388, 395, 625 A.2d 630, 634 (1993). The Majority's ruling appears to find that the trial court made an error of judgment, which does not constitute an abuse of discretion, and does not warrant disturbing the trial court's ruling. On the record presented, I cannot conclude the trial court abused its discretion in finding the child incompetent, and I would affirm its ruling.
NOTES
[1] 18 Pa.C.S.A. §§ 3121.6, 3123(a)(6), 3126(a)(7), 6301(a)(1), and 4304(a), respectively.
[2] We note that this court decided McMaster before the supreme court adopted the Pennsylvania Rules of Evidence, including Pa.R.E. 601, 42 Pa.C.S.A., Competency, effective October 1, 1998.
[3] While the transcript refers to Ms. Hawkins, it was actually Ms. Hoffman who conducted the interviews.
[4] Later in the interviews, A.A. describes her father putting his pee-pee in her pee-pee and putting his pee-pee in her butt. (Transcript of audiotaped interviews, 4, 9.)
[5] Dr. Guyer had not listened to the audiotapes prior to his testimony on February 4, 2000. (February 4th hearing at 72.) Furthermore, in addition to reviewing transcripts of A.A.'s testimony and relevant medical records and police reports, Dr. Guyer testified he had reviewed various irrelevant documents relating to A.A.'s parents' custody and divorce proceedings. (Id. at 69-70.)
[6] Our repeated and painstaking review of the tape, however, reveals no indication that Ms. Hoffman employed any of the words with which A.A. described the acts performed on her or asked any leading questions: the most that can be said is that Ms. Hoffman attempted to hold a five-year-old's attention to the subject under discussion.
[7] This limited scope of review is premised on our deference to the trial court's ability to observe witnesses and assess demeanor. In this case, however, we have been able to listen to the same evidence in the same way as the trial court.